1   HAROLD P. WEINBERGER (*admitted pro hac vice*)
    hweinberger@kramerlevin.com
2   NORMAN C. SIMON (*admitted pro hac vice*)
    nsimon@kramerlevin.com
3   EILEEN M. PATT (*admitted pro hac vice*)
    epatt@kramerlevin.com
4   KRAMER LEVIN NAFTALIS & FRANKEL LLP
    1177 Avenue of the Americas
5   New York, New York 10036
    Telephone:  (212) 715-9100
6   Facsimile: (212) 715-8000

7   Ann Marie Mortimer (State Bar No. 169077)
    amortimer@hunton.com
8   HUNTON & WILLIAMS LLP
    550 South Hope Street, Suite 2000
9   Los Angeles, California 90071
    Telephone: (213) 532-2000
10  Facsimile: (213) 532-2020

11  *Attorneys for Defendant*
    THE PROCTER & GAMBLE CO.
12

13          IN THE UNITED STATES DISTRICT COURT
14        FOR THE CENTRAL DISTRICT OF CALIFORNIA

15  VERONICA BRENNER, Individually and     Case No.: 8:16-1093-JLS-JCG
    on Behalf of All Others Similarly Situated,
16                                          **REDACTED NOTICE OF MOTION AND
                                            MOTION TO EXCLUDE THE EXPERT
17              *Plaintiff*,                TESTIMONY OF J. MICHAEL DENNIS,
                                            Ph.D; MEMORANDUM OF POINTS AND
18          v.                              AUTHORITIES IN SUPPORT THEREOF**
19
    THE PROCTER & GAMBLE CO.,               [Filed concurrently with the Declaration of
20                                          Harold P. Weinberger and exhibits thereto;
                *Defendant*.                Proposed Order lodged herewith]
21
22                                          Date:  January 12, 2018
23                                          Time: 2:30 p.m.
24                                          Assigned to: Hon. Josephine L. Staton

25

26        **REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL**

27

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## NOTICE OF MOTION AND MOTION

**TO THE CLERK OF COURT AND TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

**PLEASE TAKE NOTICE** that on January 12, 2018, at 2:30 p.m., or as soon thereafter as counsel may be heard before the Honorable Josephine L. Staton, in Courtroom 10A of the above-entitled Court, located at the Ronald Reagan Federal Building and United States Courthouse, 411 W. Fourth St., Santa Ana, CA, 92701, Defendant, The Procter & Gamble Company, ("P&G"), will, and hereby does, move the Court for an order excluding the opinion testimony by Plaintiffs' proposed survey expert, J. Michael Dennis, Ph.D., in support of their Motion for Class Certification.

Good cause exists to grant this motion. Dr. Dennis' opinion testimony is unreliable when judged under the standards of Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993).

This motion is based upon this Notice of Motion and Motion, the accompanying Memorandum of Points and Authorities, the Declaration of J. Michael Dennis, Ph.D., the Rebuttal Declarations of Dr. Keith R. Ugone and Dr. Ran Kivetz (attached as Exhibits to the Declaration of Harold P. Weinberger), the Declaration of Harold P. Weinberger filed concurrently herewith and the exhibits thereto, the pleadings and papers on file in this action, such arguments and authorities as may be presented at or before the hearing on this motion, and any other such matters as the Court may consider.

This motion is made following the conference of counsel pursuant to L.R. 7-3, which took place on October 16, 2017. Plaintiffs intend to oppose this motion.

1

1

DATED:  October 27, 2017

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

KRAMER LEVIN NAFTALIS & FRANKEL
LLP

By: /s/ Harold P. Weinberger
Harold P. Weinberger
Norman C. Simon
Eileen M. Patt

*Attorneys for Defendant*
THE PROCTER & GAMBLE CO.

2

# **TABLE OF CONTENTS**

**Page**

MEMORANDUM OF POINTS AND AUTHORITIES .......................................................1

I.      INTRODUCTION..................................................................................................1

II.     BACKGROUND ...................................................................................................2

        Dr. Dennis' Conjoint Survey ..........................................................................3

        Dr. Dennis' Perception Survey .......................................................................4

III.    LEGAL STANDARD ...........................................................................................5

IV.     DR. DENNIS' SURVEYS SAMPLED THE WRONG UNIVERSE......................6

V.      THE CONJOINT SURVEY DISREGARDS ACCEPTED
        METHODOLOGY ................................................................................................9

        A. Market Competition and Supply Side Factors Were Ignored...........................10

        B. "Attribute" and "Level" Selection is Flawed .......................................11

        C. The Conjoint Survey Introduces Bias ...................................................16

VI.     THE PERCEPTION SURVEY DISREGARDS ACCEPTED
        METHODOLOGY ..............................................................................................20

VII.    CONCLUSION....................................................................................................25

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Estate of Barabin v. AstenJohnson, Inc.*,
 740 F.3d 457 (9th Cir. 2014) ................................................................. 5

*Brighton Collectibles, Inc. v. RK Tex. Leather Mfg.*,
 923 F. Supp. 2d 1245 (S.D. Cal. 2013) ............................................... 17, 24

*Casey v. Home Depot*,
 2016 WL 7479347 (C.D. Cal. Sept. 15, 2016) ........................................ 9, 10

*Cholakyan v. Mercedes-Benz USA*, LLC
 281 F.R.D 534 (C.D. Cal. 2012) ............................................................ 6

*Daubert v. Merrell Dow Pharm., Inc.*,
 509 U.S. 579 (1993) ......................................................................... *passim*

*Ellis v. Costco Wholesale Corp.*,
 657 F.3d 970 (9th Cir. 2011) ................................................................ 6

*Dukes v. Wal-Mart, Inc.*,
 222 F.R.D. 189 (N.D. Cal. 2004) .......................................................... 23

*Gen. Elec. Co. v. Joiner*,
 522 U.S. 136 (1997) ........................................................................... 6

*Grodzitsky v. Am. Honda Motor Co.*,
 2014 WL 718431 (C.D. Cal. Feb. 19, 2014) ........................................... 6

*Icon Enters. Int'l., Inc. v. Am. Prods. Co.*,
 2004 WL 5644805 (C.D. Cal. Oct. 7, 2004) ........................................... 20

*Kournikova v. Gen. Media Commc'ns. Inc.*,
 278 F. Supp. 2d 1111 (C.D. Cal. 2003) ................................................. 18

*Kwan Software Eng'g, Inc. v. Foray Techs., LLC*,
 2014 WL 572290 (N.D. Cal. Feb. 11, 2014) ........................................... 16

ii

*Lust v. Merrell Dow Pharm., Inc.*,
   89 F.3d 594 (9th Cir. 1996) ........................................................... 5

*Morales, et al. v. Kraft Foods Grp., Inc.*,
   2017 WL 2598556 (C.D. Cal. June 9, 2017) ............................... 11

*In re NJOY, Inc. Consumer Class Action Litig.*,
   120 F. Supp. 3d 1050 (C.D. Cal. 2015) ....................................... 11

*O'Bannon v. Nat'l Collegiate Athletic Ass'n*,
   7 F. Supp. 3d 955 (N.D. Cal. 2014), *aff'd in part, vacated in part*,
   802 F.3d 1049 (9th Cir. 2015) ..................................................... 24

*Opperman v. Kong Techs., Inc.*,
   2017 WL 3149295 (N.D. Cal. July 25, 2017) .............................. 16

*Reinsdorf v. Skechers U.S.A.*,
   922 F. Supp. 2d 866 (C.D. Cal. Feb. 6, 2013) ........................... 6, 9

*Saavedra v. Eli Lilly & Co.*,
   2014 WL 7338930 (C.D. Cal. Dec. 18, 2014) .............................. 11

*Summit Tech., Inc. v. High-Line Med Instruments Co.*,
   933 F. Supp. 918 (C.D. Cal. 1996) ............................................. 19

*Valador, Inc. v. HTC Corp.*,
   242 F. Supp. 3d 448 (E.D. Va. 2017) ............................................ 6

*Wallace v. Countrywide Home Loans Inc.*,
   2012 WL 11896333 (C.D. Cal. Aug. 31, 2012) (Staton, J.)................... 16, 19

**Other Authorities**

Federal Rule of Evidence 702 .....................................................*passim*

Federal Rule of Evidence 403 ............................................................ 20

iii

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.   INTRODUCTION[1]

Defendant, The Procter & Gamble Company ("P&G"), respectfully submits this memorandum in support of its motion, pursuant to Fed. R. Evid. 702 and *Daubert v. Merrell Dow Pharma, Inc.*, 509 U.S. 579 (1993) to exclude the testimony of J. Michael Dennis, Ph.D., who has been offered as an expert on consumer surveys by Plaintiffs Victoria Brenner and Angela Banegas.[2]

In the face of real-world data revealing that Pampers Natural Clean Unscented wipes (the "Challenged Wipes") do not carry any price premium — rendering Plaintiffs' case both baseless and worthless — Dr. Dennis designed a choice-based-conjoint survey (the "Conjoint Survey") that was rigged to generate fictitious so-called "price premiums."  As set forth in the Motion to Exclude the Expert Opinion Testimony of Colin B. Weir ("Weir Motion"), filed concurrently with this motion, the Conjoint Survey did not take into account either market competition or supply side factors in contravention of the governing case law and scientific literature.  This fundamental flaw renders its results meaningless and incapable of informing Mr. Weir's damages analysis. While on that basis alone the Conjoint Survey and Dr. Dennis' testimony about it should be excluded, myriad additional flaws in his survey design further illustrate its inherent unreliability and irrelevance to this litigation.

---

[1]  Citations to deposition transcripts are referenced by each witness' last name. The deposition transcript excerpts, the Declarations of Dr. Ran Kivetz ("Kivetz Decl.") and Dr. Keith R. Ugone ("Ugone Decl."), and other exhibits cited herein are attached to the Declaration of Harold P. Weinberger, dated October 27, 2017 ("Weinberger Decl."), filed concurrently with this motion and Defendant's Opposition to Plaintiffs' Motion for Class Certification.

[2]  This motion is limited to Dr. Dennis' methodology with respect to his surveys. Defendant reserves the right to challenge other aspects of his opinions and qualifications.

1

Dr. Dennis also performed a materiality and consumer perception survey ("Perception Survey"), which purports to show that the name "Natural Clean" is material to consumers' purchasing decisions and that they understand the name "Natural Clean" to convey that the Challenged Wipes contain neither synthetic ingredients nor chemicals harmful to humans.  The Perception Survey is plagued not only with the same design flaws as the Conjoint Survey, but with several other critical problems, rendering it incapable of providing any reliable information about the impact or meaning of the name "Natural Clean."

Because Dr. Dennis' methodologically flawed surveys yielded unreliable and irrelevant data that would be unhelpful and misleading to a trier of fact, his testimony should be excluded under *Daubert* and Federal Rule of Evidence 702.[3]

## II.   BACKGROUND

On September 19, 2017, Plaintiffs filed their Motion for Class Certification, (Dkt. No. 82), proffering in support the Declarations of Mr. Weir ("Weir Decl.") and Dr. Dennis ("Dennis Decl.") (Dkt. Nos. 82-4, 82-5).  Dr. Dennis' opinions primarily concern his purported methodologies with respect to his Conjoint and Perception Surveys.

Specifically, Dr. Dennis was asked to "design, conduct and report on a consumer survey," in consultation with Plaintiffs' damages expert, Colin Weir, "to measure the market price premium, if any, solely attributable" to the "Natural Clean" name on the Challenged Wipes. (Dennis Decl. ¶ 15).  Notwithstanding that real-world market data existed —which could have been analyzed to ascertain the existence of any *actual* price

---

[3]  Defendant has advanced these and other arguments in its Opposition to Plaintiffs' Motion for Class Certification, filed concurrently with this motion. Defendant respectfully refers the Court to the Declarations of Dr. Keith R. Ugone ("Ugone Decl.") and Dr. Ran Kivetz ("Kivetz Decl.") submitted with that motion for a more detailed account of the deficiencies in Dr. Dennis' opinions.

2

premium (*see* Ugone Decl. Sections VII & VIII) — Dr. Dennis elected to conduct a choice-based-conjoint survey, the results of which he utilized to generate fictional so-called "price premiums."  In addition, Dr. Dennis was asked to "design, conduct, and report on a survey to test the materiality of the challenged claim to consumers, and to determine consumers' understanding of the challenged claim." (Dennis Decl. ¶ 15).

For both of his surveys, Dr. Dennis undertook the same analysis to (1) determine the survey population, (2) develop the survey questions, and (3) screen participants. He determined that the target population for both would be "non-institutionalized adults age 18 to 39 residing in the 50 states and the District of Colombia" who usually/mostly purchased "non-flushable" and "unscented" baby wipes, primarily for baby care, and who "had done so within the last two years."  Once a population meeting these criteria had been culled, subjects were randomly assigned to the Conjoint Survey or the Perception Survey. (Dennis Decl. ¶ 25).

## Dr. Dennis' Conjoint Survey

Subjects assigned to the Conjoint Survey were shown a series of panels that described hypothetical baby wipes product profiles.  Each participant was asked to choose one of three product profiles (along with an option to choose "none of these") twelve separate times.  (*See* Dennis Decl. ¶¶ 25, 28, 33-39).  Each profile included seven features or "attributes" that were presented in a fixed order:  "Brand," "Description on Product Package," "Other Product Descriptions," "Wipe Thickness," "Container and Lid Type," "Number of Wipes," and "Price." (Dennis Decl. ¶ 32 & Attach C, pp. 42-63).

For each attribute, an option or "level" was assigned; for example the "Brand" could be Pampers, Huggies, Honest, WaterWipes or Seventh Generation. (Dennis Decl. ¶ 33 & Attach C, pp. 50-63).  The attribute "Description on Product Package," which always appeared second in order, could be "Clean," "Natural Clean," "Sensitive" or "Sensitive Skin." (Dennis Decl. Attach C, p. 43).

3

Through what is known as a Hierarchical Bayesian Regression analysis, Dr. Dennis calculated the relative value, or the "partworth," of each attribute level in his survey.   He then used a computer simulator to compare two products (one named "Natural Clean" and the other "Clean"), keeping all other attributes constant apart from "Price" in order to determine at which price point the product with the "Natural Clean" name was equally preferable to the product with the "Clean" name. (Dennis Decl. ¶¶ 42, 47).  From this, Dr. Dennis purported to derive a "price premium percentage," reflecting the price differential between a product with the name "Natural Clean" versus one with the name "Clean." (Dennis Decl. ¶ 48).

## Dr. Dennis' Perception Survey

Subjects assigned to the Perception Survey were presented with four questions. The first was what Dr. Dennis termed a "referendum" question, and probed whether, all other product features being equal, a respondent would choose to purchase a baby wipe named "Clean" or one named "Natural Clean" (also providing an option of "Don't Know/Not Sure").  Dr. Dennis claims that "[a] preference to purchase the product with the 'natural clean'" name versus simply an identical product with the name "clean" somehow "indicate[s] that the word 'natural' in 'natural clean' is material to baby wipes purchasers." (Dennis Decl. ¶ 51).

The next three Perception Survey questions purported to measure "purchasers' understanding and expectations for a baby wipe with the 'natural clean'" name. (Dennis Decl. ¶ 25). The first — which Dr. Dennis claims was "intended to measure whether purchasers understand 'natural clean' to relate to the 'ingredients' in baby wipes" — asked, "Suppose a baby wipe product has the words 'natural clean' on the packaging . . . Do the words 'natural clean' relate to the ingredients in the baby wipes?" for which the options were functionally yes, no, and don't know. (Dennis Decl. ¶ 53).  The next asked, "Suppose a baby wipe product has the words 'natural clean' on the packaging . . . What

4

would be your expectation about the product? The baby wipes would . . ." and offered as choices: "Not contain synthetic chemicals," "Contain synthetic chemicals," or "I would have no expectation."  The final question likewise asked, "Suppose a baby wipe product has the words 'natural clean' on the packaging . . . What would be your expectation about the product? The baby wipes would . . .," and offered as choices: "Not contain synthetic ingredients that are potentially harmful to humans," "Contain synthetic ingredients that are potentially harmful to humans," or "I would have no expectation." (Dennis Decl. ¶ 53).

Dr. Dennis concluded that (i) "purchasers prefer the baby wipes with the 'natural clean' label by a margin of 83.2% to 14.7%"; (ii) "purchasers understand the 'natural clean' label to relate to the 'ingredients' in the product (79.8%)"; and (iii) "purchasers almost unanimously expect a 'natural clean' baby wipes product to 'not contain synthetic chemicals' (93.7%) or 'not contain synthetic ingredients that are potentially harmful to humans' (94.3%)."  (Dennis Decl. ¶ 54).

## III.   LEGAL STANDARD

Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993) govern the admissibility of expert testimony. The burden of establishing admissibility of such testimony falls with the proponent. *Lust v. Merrell Dow Pharm., Inc.,* 89 F.3d 594, 598 (9th Cir. 1996). District courts serve a gatekeeping function to ensure that scientific testimony or evidence is not admitted unless it is both relevant and reliable. *Daubert*, 509 U.S. at 589; *see also Estate of Barabin v. AstenJohnson, Inc.*, 740 F.3d 457, 463 (9th Cir. 2014).

The relevance inquiry seeks to limit testimony that does not "logically advance a material aspect of the party's case," *Barabin*, 740 F.3d at 463 (citation and quotations omitted). Reliability requires the Court to determine that "the testimony is based upon sufficient facts or data, . . . is the product of reliable principles and methods; and . . . the

5

expert has applied the principles and methods to the facts of the case." Fed. R. Evid. 702; *see also Reinsdorf v. Skechers U.S.A.*, 922 F. Supp. 2d 866, 878 (C.D. Cal. Feb. 6, 2013) ("[t]he first step in the court's analysis of any survey . . . is to determine whether the survey is admissible, relevant, and conducted according to accepted principles.").

"The trial court's gatekeeping function requires more than simply 'taking the expert's word for it.'" Fed. R. Evid. 702 advisory comm. note (2000). "The expert's testimony must be grounded in an accepted body of learning or experience in the expert's field, and the expert must explain how the conclusion is so grounded." *Id*. "[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).

The requirements of *Daubert* and Rule 702 apply to expert testimony proffered in connection with class certification. "If expert testimony critical to class certification is challenged, a district court must make a determination as to the admissibility and persuasiveness of that evidence before certifying a class." *Grodzitsky v. Am. Honda Motor Co.*, 2014 WL 718431, at *6 (C.D. Cal. Feb. 19, 2014) citing *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970 (9th Cir. 2011); *see also Cholakyan v. Mercedes-Benz USA*, LLC, 281 F.R.D 534, 541-42 (C.D. Cal. 2012).

## IV.  DR. DENNIS' SURVEYS SAMPLED THE WRONG UNIVERSE

"'Selection of the proper universe is a crucial step [in survey design], for even if the proper questions are asked in a proper manner, if the wrong persons are asked, the results are likely to be irrelevant.'" (Kivetz Decl. ¶ 39) (quoting Professor McCarthy). In particular, if a survey is under-inclusive, "'there is generally no way to know how the unrepresented members of the target population would have responded.'" (*Id.*) (citing Professor Diamond's *Reference Guide to Surveys* at 379); *see also Valador, Inc. v. HTC Corp.*, 242 F. Supp. 3d 448 (E.D. Va. 2017) (survey excluded because it sampled wrong

6

population, lacked a control, and used leading questions).

Dr. Dennis' Conjoint and Perception Surveys did not sample a relevant population. *First*, examining the raw data, Dr. Kivetz ascertained that the majority of participants in Dr. Dennis' national sample — 69% of the Conjoint Survey universe and 71% of the Perception Survey universe — live outside the ten putative Class states and the District of Columbia.[4]   Thus, Dr. Dennis' "sample includes irrelevant customer segments that do *not* represent the putative Class members," which had the effect of "introducing irrelevant data." (*See* Kivetz Decl. ¶ 45 & n. 30).

*Second*, only those respondents whose "main use of moistened baby paper wipes in the past two years" was for "baby care and cleaning" were allowed to participate in the surveys. (Dennis Decl. Attach B, p. 3).  Dr. Dennis excluded anyone whose main use of baby wipes was instead "Car care," "House cleaning," "Non-baby care and cleaning," or even just "Other uses."  (Dennis Decl. Attach B, p. 3; *see also* Dennis Tr. 125-128; Kivetz Decl. ¶ 46).  This restriction removed relevant segments of the Challenged Wipes' purchasing population in a manner that increased preference for the "Natural Clean" name (thereby inflating the supposed "price premium" supposedly derived from the survey data).  As Dr. Kivetz explains,

---

[4] Plaintiffs' putative Class seeks to include "[a]ll persons who purchased one or more units of Pampers Natural Clean Wipes" in California, Delaware, Florida, Kansas, Missouri, New Jersey, Ohio, Utah, Virginia, West Virginia, and the District of Columbia, and excluding only those who purchased the wipes for purposes of resale. (Plaintiffs' Motion for Class Certification, Dkt No. 79, p. 4.).

7

███████████████████████████████████████████████████ (Kivetz Decl. ¶ 46).[5]  By restricting the survey population in this manner, Dr. Dennis inexplicably "effectively eliminate[d] ███████████████████████████████████████████████████████████ ██████████████████████████████." (Kivetz Decl.¶ 50).

*Third*, Dr. Dennis excluded survey participants who mostly purchase scented wipes or selected "Don't know / Hard to say" when asked if they mostly purchase scented or unscented baby wipes. (Dennis Decl. Attach B, p. 3).[6] ████████████ ██████████████████████████████████████ (Ugone Decl. ¶ 131). Given that unscented is one of the contextualizing claims intended to convey meaning as to "Natural Clean" to consumers, the survey is "inappropriately . . . limited to only purchasers of mostly unscented wipes [who] would obviously reveal increased preferences for wipes that survey participants perceive as unscented due to a 'Natural Clean' description[.]" (Kivetz Decl. ¶ 53).  Additionally, real-world Product purchasers

████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ (Ugone Decl. ¶133). This is consonant with the testimony of Named Plaintiff Angela Banegas, who described how she "continue[d] to purchase wipes after [her] children stopped using them continuously, just around the house . . . ." (Banegas Tr. 49-50).

[6] Notably both Named Plaintiffs likely would have been excluded from participating in Dr. Dennis' surveys by selecting "Don't know/ Hard to Say" in response to whether they typically purchase "Scented" versus "Unscented" wipes. (Banegas Tr. 42; Brenner Tr. 114; *see also* Kivetz Decl. ¶¶ 54-57).  Further, as Dr. Ugone demonstrates, contrary to Dr. Dennis' sample selection criteria, ███████████████████████████████████████ ████████████████████████████████████████████████████ (Ugone Decl.¶ 131) (emphasis added).

who may be indifferent as between unscented and scented wipes — and buy the two interchangeably — were inappropriately excluded from Dr. Dennis' survey. (Kivetz Decl. ¶ 57).

*Fourth*, Dr. Dennis' survey population excluded anyone over the age of 39. There is no justification for this cutoff, especially given that individuals over age 40 might have a different relationship to the words "Natural Clean" than those in their 20s and 30s, who became market participants at a time of prevalent organic product offerings. (*See*, *e.g.*, Brizendine Tr. 219-224).[7]

*Finally*, Dr. Dennis conducted no validation to confirm that the people completing his surveys were the presumed participants and actually met the screening criteria. He also failed to exclude participants who had taken a market research survey in the prior three or six months, contrary to standard practice in litigation surveys. (Kivetz Decl. ¶ 59).

## V.   THE CONJOINT SURVEY DISREGARDS ACCEPTED METHODOLOGY

Even had Dr. Dennis not employed a fatally flawed survey universe, he flouted other critical tenets of survey design and analysis, rendering his Conjoint Survey and ensuing data completely unreliable and inadmissible. *See Reinsdorf*, 922 F. Supp. 2d at 878 ("Unless survey evidence is conducted according to accepted principles, it is not admissible in the first instance."); *see also Casey v. Home Depot*, 2016 WL 7479347, at *21 (C.D. Cal. Sept. 15, 2016) ("the issues with the survey's administration and design do not merely go to the evidentiary weight of the survey: they demonstrate substantial

---

[7] Dr. Dennis was well aware when he designed his surveys that P&G's Associate Brand Director, Chad Brizendine, had testified that the wipes category has changed dramatically in the last few years with the introduction of organics. (Dennis Tr. 77-82). Consumer understanding of the word "natural" in the product category (and any alleged associated "price premium") thus may be different, for example, in a 2017 purchasing population than in a 2012 purchasing population.

9

deficiencies that fundamentally undermine the reliability of the survey's results and are grounds for its complete exclusion") (internal citations and quotations omitted).

### A. Market Competition and Supply Side Factors Were Ignored

Most critically, as set forth in detail in the Weir Motion, Dr. Dennis accounted for neither market competition (*id.* pp. 12-16 ) nor supply side factors (*id.* pp. 16-20) in the design of his Conjoint Survey and in his analysis of the survey data.  In short, rather than perform a market simulation as he contends, Dr. Dennis did nothing more than calculate a choice preference between an unrealistically named product ("Clean") and a product named "Natural Clean" in a market where there are no other options (aside from a "none" option) and all other attributes such as price and scent, for example, are identical.[8] The resulting so-called "price premiums" Dr. Dennis claims to have derived are therefore totally contrived and meaningless in the real world and cannot serve as a basis from

---

[8] Notably, when asked during his deposition why he can hold supply constant if there is a reduction in demand, Dr. Dennis replied: "That's not my assignment. My assignment is to measure how much value these consumers place on that Natural representation." (Dennis Tr. 245). He reiterated this again when asked whether he thought it was counter-intuitive that if the demand were to drop in his "but-for" world that supply would not? He acknowledged that potentially it could but explained that was not what he was calculating: "Well, because I am measuring the *consumer preference shares*, and the consumer preference shares are based on the availability of this product on the assumption that the consumers would have this product available to them if they purchased it." (Dennis Tr. 252) (emphasis added). Furthermore, when asked then how exactly he simulated the impact of competitive responses in calculating the alleged price premiums he explained: "A. Well, I think it's a fair statement that that is not a capability that conjoint survey have. Q. So you don't do it. A. Not just me. Anybody who does conjoint surveys, you are measuring what consumers preferences are going to be given different product profiles put in front of respondents." (Dennis Tr. 256; *see generally* Dennis Tr. 249-256). This testimony is logically inconsistent with Dr. Dennis' insistence that he calculated "price premiums."

which to calculate damages.[9]  We incorporate by reference these criticisms, which are set forth in detail in the Weir Motion, and singularly render Dr. Dennis' Conjoint Survey inadmissible. Courts in this District have rejected conjoint surveys proffered for purposes of calculating price premium damages that failed to account for supply side factors, as is true with respect to the Conjoint Survey here. *See*, *e.g.*, *Morales, et al. v. Kraft Foods Grp., Inc*., 2017 WL 2598556 (C.D. Cal. June 9, 2017); *In re NJOY, Inc. Consumer Class Action Litig*., 120 F. Supp. 3d 1050 (C.D. Cal. 2015) ("*NJOY  I*"); *see also Saavedra v. Eli Lilly & Co*., 2014 WL 7338930 (C.D. Cal. Dec. 18, 2014).

### B. "Attribute" and "Level"  Selection is Flawed

Dr. Dennis' Conjoint Survey is flawed even as a rudimentary instrument to calculate a choice preference.  It is critical that a survey "be designed to mirror as closely as possible the essential characteristics of the marketplace."  (Kivetz Decl. ¶ 63).  Here, Dr. Dennis "failed to present many wipes aspects, features, benefits, and claims that in actuality are important in many consumers' purchase decisions."  (Kivetz Decl. ¶ 65). As Dr. Kivetz explains, the Conjoint Survey's "violation of marketplace conditions — including improperly focusing participants on the 'Natural Clean' claim (at the expense of many other wipes' features and claims) — is an artificial and blunt limitation of consumers' knowledge and information."  (Kivetz Decl. ¶  68).

Dr. Dennis acknowledged that "[a]ttribute selection [is] probably the most important decision that a conjoint designer has to make."  (Dennis Tr. 158-159).  But he did not at all heed that principle in designing his Conjoint Survey. As Dr. Kivetz

---

[9] Like Mr. Weir, Dr. Dennis was pressed at his deposition for any authority supporting the notion that the determination of a price premium for historical purposes need not require consideration of competitive marketplace and supply-side factors.  (Dennis Tr. 244-253).  On October 24, the day P&G's expert reports were due, Plaintiffs' counsel identified three authorities purporting to support this notion, none of which addresses the issue at all.  (*See* Weinberger Decl. ¶ 2 & Exhs. 20, 21 & 22,; *see also* Ugone Decl. pp. 113-114, n. 300; Kivetz Decl. ¶ 138).

discusses in detail (in reference to P&G's market research), consumers factor a "variety of . . . attributes" that Dr. Dennis failed to include into their purchasing decisions for baby wipes. (*See* Kivetz Decl. ¶¶ 69-70). By excluding many of these key attributes, Dr. Dennis "over-estimated the effect of the included attributes, including the 'Natural Clean' claim." (Kivetz Decl. ¶ 70). For example, the "look, design and visual appeal of the wipes package is also a key factor driving many consumers' purchase decisions" and "some consumers may not even notice or remember the product's name and may instead be drawn to more visually salient elements of the package or package design . . . ." (Kivetz Decl. ¶ 72).[10]   Indeed, market research shows that "attractiveness of the packaging is an important determinant of consumer purchases of consumer packaged goods." (Kivetz Decl. ¶ 73). But participants in the Conjoint Survey were not shown any package imagery, artificially excluding the salient visual cues on which consumers rely in making purchasing decisions and thereby "inflating the measured importance of the tested attributes." (Kivetz Decl. ¶ 73).

To develop his list of attributes, Dr. Dennis relied on seven interviews with women (ages of 18-40) who had primary responsibility for taking care of a baby and had purchased wipes in the past five years for "background information on what product features drive purchasing behavior for purchasers of baby wipes . . . ." (Dennis Decl. ¶ 21). These interviews supposedly informed which attributes he included in the Conjoint Survey's product profiles. (Dennis Decl. ¶ 31). This procedure was "highly problematic" because of the very small sample size and the non-representative screening of these few

---

[10] Mr. Brizendine testified: "I don't think all consumers even know the names of the products they buy. I've been in qualitative research in my career where people say, I buy the teal one, and they don't even know what the name of the product is." (Brizendine Tr. 110-111). This testimony is corroborated by Named Plaintiff Angela Banegas, who referred to the alternate Pampers product she purchased as the "light blue box." (Banegas Tr. 41).

interviewees — among other problems, women who use wipes for reasons other than baby care and cleaning were excluded, omitting a substantial purchasing segment. (Kivetz Decl. ¶ 74; *see* discussion *supra*, pp. 7-8).

Even worse, Dr. Dennis did not even include a number of attributes mentioned by interviewees — or others identified in P&G's market research, which Dr. Dennis also claims to have relied upon to inform his attribute selection (Dennis Decl. ¶ 31) — such as texture, ████ moistness, absorbency, not tearing, and the availability of loyalty programs. (Kivetz Decl. ¶¶ 70, 75). Indeed, "it is unclear what standard, if any, Dr. Dennis applied when selecting the attributes to include in his conjoint survey, [given that] even his own interviews reveal that his conjoint survey used a highly incomplete set of wipes attributes, features, and claims." (Kivetz Decl. ¶ 75; *see also* ¶ 79). As Dr. Kivetz explains, a review of the Challenged Wipes (and competitive products) shows that in the actual marketplace consumers encounter many more packaging claims than the ones included in the Conjoint Survey. (*See* Kivetz Decl. ¶¶ 76-77). Once again, by excluding such attributes, Dr. Dennis narrowly focused participants on only the few he included, thereby increasing the weight of "Natural Clean."

Because academic research on behavioral economics has shown that consumers tend to "cancel out" attributes that are not described, focusing instead on what is presented, Dr. Dennis' survey "led participants to ignore other relevant information and purchase considerations" resulting in a "highly unrealistic, artificial, and leading conjoint choice task that does *not* predict consumers' true" willingness to pay (let alone alleged "price premium") for the name "Natural Clean." This is a survey flaw known as focalism bias. (Kivetz Decl. ¶¶ 80-83). Dr. Dennis' survey "led participants to conclude that the featured 'Natural Clean' claim constituted an important feature of the 'profiled' wipes; this in turn, biased upward the choice probability of a 'profiled' wipes that included the challenged claim." (Kivetz Decl. ¶ 84). "The fact that the Dennis Conjoint Survey did not

13

even come close to mirroring marketplace experiences and conditions is a major shortcoming, which results in lack of predictive validity . . . and prevents reaching any conclusions about the contested issue." (Kivetz Decl. ¶ 85).

The notion that Dr. Dennis somehow accounted for market competition in his selection of "competing brands" is equally flawed because the "levels" he selected are not a true cross-section of the wipes market.[11]  Nor did he include private label brands that compete with Natural Clean, such as products from Target and Wal-Mart.[12] Tellingly, "three out of seven females that [Dr. Dennis] interviewed were purchasers of private label baby wipes" and ██████████████████████████████████ ████████████████████████████████."  Dr. Dennis' choice of brands was ████████████████████████████████████ did not represent relevant choices faced by consumers in the real-world." (Ugone Decl. ¶ 128).[13]

For his second attribute, "Description on Product Package," Dr. Dennis offered four levels — "Clean," "Natural Clean," "Sensitive," and "Sensitive Skin" — where one of the three is clearly not like the others.  "The word 'Clean' does not reasonably convey a product characteristic or benefit to the consumer, and as a result it would not make

---

[11] Honest, Seventh Generation and WaterWipes have a different market positioning in terms of consumer perception and price, and make up a small portion of the wipes market.  (*See* Brizendine Tr. 218-223 (describing this market positioning); Ugone Decl. ¶ 128 & n. 236 ████████████████████████████████ ████████████████████████████████████████ ████████████████████████████.

[12] *See* Ugone Decl. ¶ 128.

[13] Further, Dr. Dennis included males in his final survey population but spoke with none during his in-depth interviews; accordingly, he did not ascertain whether their purchase drivers may be different from women and did not account for whatever those drivers might be. (*See* Ugone Decl. ¶¶ 135-136).

14

sense to display the word 'Clean' on a wipes product package without any modifier or qualifier. By the same logic, a restaurant might tout 'friendly service,' 'fast service,' or 'great service' but would be unlikely to simply display the term 'service' on its own." (Kivetz Decl. ¶ 124; *see also* Ugone Decl. ¶ 109).   Dr. Dennis provides no reasonable explanation as to why he selected this option to the exclusion of actual competitive names.  He acknowledged that he ████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████ (Dennis Decl. ¶ 55).[14]  All of these options convey information beyond the word "Clean," while "Clean" itself does not inform consumers about the benefits of the product and is not a valid alternative name for use in attempting to measure consumer preference or to calculate the impact of the name "Natural Clean" on consumer choices.[15]

For the "Other Product Descriptions" attribute in the Conjoint Survey, Dr. Dennis included seven levels:  "Hypoallergenic," "Touch of Aloe," "0% Parabens," "Softer for Sensitive Skin," "Alcohol Free," "Medical-Grade Cloth," and "Unscented." All but three are found on the Natural Clean label. (Dennis Decl. ¶ 37; *see also* Weinberger Exh. 5). As noted, Dr. Dennis failed to include key attributes identified by ██████████████

████████████████████████████████████████████████████████████████████

---

[14] As Mr. Brizendine testified, P&G intended to convey to consumers the Challenged Wipes' gentle, unscented cleaning nature. (Brizendine Tr. 184).

[15] According to generally accepted survey methodology, a control stimulus like the word "Clean" in the Conjoint Survey "must be as commercially viable, and as attractive, as the challenged claim" or it risks measuring differences in preference that arise due to "factors that are irrelevant to the case." (Kivetz Decl. ¶ 125) (citing Diamond, p. 399). More than preference for "Natural Clean" Dr. Dennis may have simply measured a low valuation of its implausible alternative, "Clean," a fact that the data seems to support. (*See* Kivetz Decl. ¶¶ 127-128).

███████████████████████████████████

███████████ as well as attributes for which his in-depth interviewees expressed preferences. (*See supra*, p. 14).[16] Dr. Dennis also did not include any product descriptions similar to Pampers Baby Fresh wipes, which he was aware P&G deems to be the most comparable baby wipe to the Challenged Wipes. (Dennis Tr. 154).

As both Dr. Ugone and Dr. Kivetz explain, Dr. Dennis' Conjoint Survey does not capture the real-world choices faced by the consumers of the Challenged Wipes and therefore cannot accurately measure the marketplace demand for the "Natural Clean" name. By focusing respondents' attention on these limited features at the expense of many others, Dr. Dennis overemphasized their importance to respondents, therefore measuring a larger impact for the included features than what actually exists in the marketplace. (Ugone Decl. ¶¶ 127-129; Kivetz Decl. ¶¶ 69-85). *See*, *e.g.*, *Opperman v. Kong Techs., Inc.*, 2017 WL 3149295, at *10-12 (N.D. Cal. July 25, 2017) (rejecting damages model based on conjoint survey that failed to account for relevant attribute mix, noting that profiles expert suggested using would measure importance of security features generally rather than specific security feature at issue).

### C. The Conjoint Survey Introduces Bias

Courts often consider whether "questions were leading or suggestive" and, whether a "survey's methodology and execution were in accordance with generally accepted standards" in evaluating the admissibility of a survey. *Kwan Software Eng'g, Inc. v. Foray Techs., LLC*, 2014 WL 572290, at *4 (N.D. Cal. Feb. 11, 2014) (citation omitted). Courts are also critical of surveys that introduce bias. *See Wallace v. Countrywide Home Loans Inc.*, 2012 WL 11896333, at *3 (C.D. Cal. Aug. 31, 2012)

---

[16] *See* Ugone Decl. ¶ 77. Notably, Named Plaintiff Angela Banegas agreed that a broad range of wipe attributes could affect consumer purchasing decisions, including: whether they are gentle and soft, texture, absorbing fibers, being mild on skin, preventing diaper rash, and general efficacy. (Banegas Tr. 64-67).

16

(Staton, J.) (rejecting survey that was flawed in several respects, most "significant infirmity" of which was "the presence of bias"). Here — apart from the fundamental flaws already described that render the Conjoint Survey results meaningless — it is further plagued and rendered completely unreliable because Dr. Dennis introduced a number of different forms of bias in his design, all of which have the same effect of increasing respondents' selection for "Natural Clean."

As discussed, (*supra*, pp. 13-15), Dr. Dennis introduced a "focalism bias" not only by failing to approximate the real marketplace, thereby giving more prominence to "Natural Clean," but also by presenting the name out of the context of its packaging, where in actuality it was always displayed alongside the word "unscented." (*See* Ugone Decl. ¶ 74; Kivetz Decl. ¶ 97). As Dr. Kivetz explains, by showing claims out of any visual context and within the context of (as noted above) an inappropriately narrow attribute universe, the survey put greater weight on the attributes that were present. (Kivetz Decl. ¶¶ 84-85). *See Brighton Collectibles, Inc. v. RK Tex. Leather Mfg*., 923 F. Supp. 2d 1245, 1257 (S.D. Cal. 2013) (excluding plaintiff's survey evidence where design improperly suggested to participants "correct answer").

For example, in the survey choice profiles, "Natural Clean" was a choice for "Description on Product Package" and "Unscented" was an "Other Product Descriptions" option. Sometimes these were displayed together, and other times they were not. By artificially separating the name from its description, Dr. Dennis' survey likely distorted participants' interpretations of "Natural Clean." As Dr. Kivetz explains: "The phrase 'unscented' can make the 'Natural Clean' redundant for some consumers. Further, the 'unscented' representation provides context for the 'Natural Clean' claim, which can prompt consumers to perceive the 'Natural Clean' claim as referring to lack of scent as opposed to absence of synthetic ingredients.  Thus . . . by artificially separating the challenged 'Natural Clean' claim from the 'unscented' claim, the Dennis

17

Conjoint Survey was likely to confuse participants and also inflate the estimated [willingness-to-pay] for the 'Natural Clean' claim." (Kivetz Decl. ¶ 32; 61-65).[17]

Notwithstanding that the "look, design and visual appeal of the wipes package" is important, to consumers' purchasing decisions — indeed, Plaintiffs' concede as much by pleading, "[i]n purchasing the Wipes, [Ms. Brenner] relied on Defendant's false, misleading, and deceptive representation that the Wipes provided only a 'natural clean,' which was depicted on a green package . . . *alongside images and flowers and leaves*" (*see*, *e.g.*, Second Amended Consolidated Complaint, Dkt No. 59, ¶ 13) (emphasis added) — Dr. Dennis' Conjoint Survey did not include the actual packaging in his product profiles, which may have "distorted participants' comprehension and interpretation of [Natural Clean]" in a manner that inflated its importance and participants' willingness-to-pay. (Kivetz Decl. ¶ 89). This complete divorcing of the claim at issue from the context in which it appears to consumers is yet another reason why the Conjoint Study should be excluded. *See Kournikova v. Gen. Media Commc'ns. Inc.*, 278 F. Supp. 2d 1111, 1125 (C.D. Cal. 2003) (finding plaintiff's survey inadmissible where "respondents were only allowed to view digital photos of the magazine's cover and spine," noting the "seriousness of this deficiency becomes more apparent when one considers Plaintiff's FAC, which alleges that the magazine as a

---

[17] Further bias was introduced through the way in which descriptions of certain attributes were framed. Dr. Dennis introduced the "Description on Product Package" (i.e., "Natural Clean") by explaining that it "helps the consumer to distinguish between the different kinds of baby wipes made by the brand," thereby artificially increasing its importance as compared with the "Other Product Descriptions," which was introduced as merely "some of the features of the baby wipes." (Dennis Decl. ¶¶ 32, 33; *see also* Kivetz Decl. ¶¶ 120-123). This both further contributed to the survey's focalism bias by elevating the prominence of "Natural Clean," and introduced a demand effect — a phenomenon by which participants use contextual cues to figure out the purpose of the study and try to give the "correct" or expected answer — signaling that "Natural Clean" was important. (Kivetz Decl. ¶ 67).

18

whole . . . gave potential customers the impression of Plaintiff's endorsement.") (internal citations omitted); *Summit Tech., Inc. v. High-Line Med Instruments Co.*, 933 F. Supp. 918, 931 (C.D. Cal. 1996) (phrase "perfectly reliable" was not misleading in "context of the entire advertisement").

Dr. Dennis also introduced bias in the Conjoint Survey through "order effects." By failing to rotate the order of the attributes on the product profiles, the "Description of Product" (i.e., "Natural Clean" or "Clean") was always presented second, and the "Price" was always presented last.  This had the effect of inflating the weight of the former and diminishing that of the latter. Attributes that appear earlier tend to be more important for respondents than attributes that appear later. Research demonstrates this is particularly true for choice-based-conjoint surveys with respect to the "Price" attribute. Conjoint scholars recommend that the order of attributes be randomized across respondents, which is also consistent with general survey design principles. (*See* Kivetz Decl. ¶¶ 114-118).

Finally, the Conjoint Survey presents evidence of "extreme response behavior," wherein participants never choose a "no-purchase" option. The survey data show that 74% of the participants never chose the "no-purchase" option (i.e., these participants indicated that they would always purchase one of the three wipes "profiles" shown to them in each of the 12 choice scenarios).  The high rate of respondents who never chose the "None of these" (no-purchase) option undermines the validity of Dr. Dennis' estimates. (Kivetz Decl. ¶ 119); *see also Wallace*, 2012 WL 11896333, at *4 ("A survey that begins with a random sample but does not take measures to assure that nonresponses are random and provide analysis of the reasons of nonresponse is not the product of reliable principles and methods.") (citations and quotations omitted).

19

# VI.   THE PERCEPTION SURVEY DISREGARDS ACCEPTED METHODOLOGY

Much like his Conjoint Survey, Dr. Dennis' Perception Survey — which employed the same irrelevant population described above (*see supra*, pp. 6-9 ) — suffers from a number of additional severe design flaws that should render it inadmissible. While flaws in survey design and execution more often go to weight, where there are "serious flaws . . . reliance on that survey [is] unreasonable." *Icon Enters. Int'l., Inc. v. Am. Prods. Co*., 2004 WL 5644805, at *22 (C.D. Cal. Oct. 7, 2004) (internal citations and quotations omitted). "If the flaws in the proposed survey are too great, the court may find that the probative value of the survey is substantially outweighed by the prejudice, waste of time, and confusion it will cause[.]" *Id.* at *22, n. 18 (citation and quotations omitted); *see also* Fed. Rule Evid. 403. Here, the Perception Survey flaws are so egregious that we respectfully submit that it should be excluded.

As Dr. Kivetz described, because the survey's introduction informed participants that they will be asked about "what factors are important or not important to [them] when deciding to purchase baby wipes," (Dennis Decl. Attach B, p. 11), and then asked "four directed, closed-ended questions that focused on 'natural clean' and the importance of, and expectations from, such a claim," the survey suggested to participants that the researcher thinks "natural clean" is important and that the expected (or "right") answers are those confirming that hypothesis. (Kivetz Decl. ¶ 205).

The first question asked participants to choose between "two products [that] cost the same and are the same in every way except for a difference in the type of baby wipes." (Dennis Decl. Attach B, p. 12). Participants were then shown two hypothetical products "for which six out of seven of the listed attributes did *not* have any values specified, but rather just displayed the word 'Same.'" The only difference was that one was described as "Clean" and the other "Natural Clean" (with the words in bold and

20

emphasized relative to the word 'Same'). (Kivetz Decl. ¶ 206). Because this is such a "hypothetical and abstract choice set [it] clearly suggests to the participants that the product described as 'Natural Clean' must be preferred over the product characterized as just 'Clean,' otherwise the question would never have been asked.  Furthermore, the question's introduction and the choice set clearly suggested to participants that 'natural' is an important product characteristic because it can differentiate between two otherwise completely identical products." (Kivetz Decl. ¶ 206).

Apart from the fact that for the reasons described above (*see supra*, pp. 14-15) "Clean" is an inappropriate and commercially implausible alternative to "Natural Clean," this "referendum" question was a meaningless exercise. "[T]here is *no* doubt that Dr. Dennis's materiality test made it obvious for participants that the survey [was] testing their beliefs (or lay theory) about the importance and desirability of a 'natural' product description.  This, in turn, led participants to guess and respond in a socially-desirable manner and according to their lay theories about this topic, as opposed to exhibit their true preferences, purchase behaviors, and willingness-to-pay in the actual marketplace." (Kivetz Decl. ¶ 170). The question violated marketplace conditions in that it made no mention of any other aspect, feature, claim or benefit of the wipes. It did not ascertain the "materiality" of "Natural Clean" relative to anything but the word "Clean" in a vacuum in which potentially more salient features and claims were removed. The results thus "do *not* provide any insights into consumers' true preferences and perceptions regarding the disputed wipes and the challenged claim." (*See* Kivetz Decl. ¶ 180).

Before moving on to the next three questions, participants were thanked for answering "our question about what is important or not important to you about baby wipes" and told "[w]e have just three more questions." Participants were then asked questions that were solely focused on the name "Natural Clean."  As Dr. Kivetz

21

explains, this likely reinforced a demand effect in that the "the researcher thought that the 'Natural Clean' description is an important characteristic of wipes that influences purchase decisions and creates positive expectations." (Kivetz Decl. ¶ 174).

Dr. Dennis' three remaining "consumer perception" questions all displayed the words "natural clean" on a green background but without any actual packaging elements.  This offered participants no meaningful context by which to determine how they actually perceive the name in reality and, for the same reasons described above (*see supra*, pp. 18-19), cannot provide any meaningful data on consumer perceptions of the actual product label in the marketplace.  The first of these three questions probed whether the "Natural Clean" name did or did not relate to ingredients.  Asking whether consumers would expect the words "Natural Clean" to relate to the ingredients fails to reveal whether they could also (or instead) expect the words "Natural Clean" to relate to, for example, the unscented or hypoallergenic nature of the Challenged Wipes.  Even Dr. Dennis conceded that it is possible that consumers can interpret the 'Natural Clean' claim to mean unscented.  (Dennis Tr. 331).

Dr. Dennis next asked participants if they had an expectation as to whether the product would contain synthetic chemicals or not.  This was immediately followed by the last question, which probed if they had an expectation as to whether the product would contain synthetic ingredients that are potentially harmful to humans or not.[18]  "By asking participants such directed questions that are solely focused on ingredients and synthetic chemicals, the questions introduce[d] these concepts to the participants and eliminate[d] any other possible interpretations of the 'natural clean' claim." (Kivetz

---

[18] These closed-ended questions offered a third option "I would have no expectation," but did not allow participants the opportunity to answer "Other" or "None of these."

Decl. ¶ 207).[19] Dr. Dennis should instead "have shown participants an actual disputed Pampers package, used proper filter questions, and asked participants non-leading *open-ended* questions about what, if anything, does 'natural clean' communicate to them." (*Id.*).   *See Dukes v. Wal-Mart, Inc.*, 222 F.R.D. 189, 197 (N.D. Cal. 2004) (finding survey "biased on its face" provided suggestive options instead of asking opened-ended questions).

The biased nature of these questions can best be seen in the inconsistent results of the data.  Dr. Dennis failed to filter out the 20% of respondents who did not agree that "Natural Clean" related to the ingredients in the wipes, and so those individuals were also asked about their expectations of the nature of any ingredients in the wipes. Of those 20% who did not agree that the challenged claim related to the Challenged Wipes' ingredients, 81% nevertheless agreed that they would expect a baby wipe named "Natural Clean" not to contain synthetic ingredients — and an even higher percentage, 87%, expected the wipes to not contain harmful synthetics. As this demonstrates, and as Dr. Kivetz describes in further detail, numerous participants reversed their answers in ways that were internally inconsistent as between the three "consumer perception" questions. These internally inconsistent answers further demonstrate that the Perception Survey's "questions were fatally flawed and biased in favor of the Plaintiffs' position in

---

[19] Dr. Dennis also failed to use filter questions "to assess whether, in fact, participants even noticed, perceived, or thought about the disputed wipes products' ingredients, synthetic ingredients, or the 'Natural Clean' claim" before asking them whether the name related to the ingredients. "By avoiding filter questions, [the Perception Survey] presupposed that, when making purchase decisions regarding wipes, consumers pay attention to, perceive, and consider the 'Natural Clean' claim and the issue of product ingredients, in general, and *synthetic ingredients*, in particular. The failure to include proper filter questions is important because it increased participants' guessing behavior and answering based on the survey's pre-suppositions, and generated grossly-distorted estimates of the materiality and perceptions of the challenged 'Natural Clean' claim." (Kivetz Decl. ¶ 194; *see also* Kivetz Decl. ¶¶ 190-197).

23

this case." (Kivetz Decl. ¶ 217; *see also* ¶¶ 212-216). *See O'Bannon v. Nat'l Collegiate Athletic Ass'n*, 7 F. Supp. 3d 955, 975 (N.D. Cal. 2014), *aff'd in part, vacated in part*, 802 F.3d 1049 (9th Cir. 2015) (finding flaws in Dr. Dennis' survey such that it did not provide credible evidence; survey produced internally inconsistent results and participants' responses suggested that survey questions may have "primed" them to view subject matter in a partial way).

Finally, Dr. Dennis' Perception Survey inexplicably failed to use any control. A control is a "fundamental principle of survey design" (Kivetz Decl. ¶ 218) and particularly critical here, where it is likely that survey participants were merely responding to questions based on their expectations of baby wipes generally — led by the flawed nature of the survey — and not specifically the name "Natural Clean." As Dr. Kivetz explains, "It is important to recognize the combined impact of relying on extremely leading closed-ended questions and on a severely flawed methodology that blatantly violated marketplace conditions to obtain the desired results, while failing to include any control. This combination made the . . . Perception Survey redundant, because there should have been no doubt about the 'findings' that would be produced by the survey's leading introduction and (closed-ended) questions and various demand, order, focalism, and other biases. The lack of any control guaranteed that no attempt would be made to correct some of the bias, demand effects, and flaws inherent in the . . . Perception Survey, thus making the results uninterpretable and unreliable." (Kivetz Decl. ¶ 222). *See also Brighton*, 923 F. Supp. 2d at 1257-58 (leading questions exacerbated where expert did not use control).

## VII.  CONCLUSION

For the reasons articulated herein, P&G respectfully requests that the Court exclude the Conjoint and Perception Studies conducted by and testimony of J. Michael Dennis on grounds of irrelevance, unreliability, and inadmissibility under the standards of Federal Rule of Evidence 702 and *Daubert*.

Dated:  October 27, 2017    Respectfully submitted,

           KRAMER LEVIN NAFTALIS & FRANKEL LLP


           By: /s/ Harold P. Weinberger
           Harold P. Weinberger
           Norman C. Simon
           Eileen M. Patt

           *Attorneys for Defendant*
           THE PROCTER & GAMBLE CO.

25