HAROLD P. WEINBERGER (*admitted pro hac vice*)
hweinberger@kramerlevin.com
NORMAN C. SIMON (*admitted pro hac vice*)
nsimon@kramerlevin.com
EILEEN M. PATT (*admitted pro hac vice*)
epatt@kramerlevin.com
KRAMER LEVIN NAFTALIS & FRANKEL LLP
1177 Avenue of the Americas
New York, New York 10036
Telephone: (212) 715-9100
Facsimile: (212) 715-8000

Ann Marie Mortimer (State Bar No. 169077)
amortimer@hunton.com
HUNTON & WILLIAMS LLP
550 South Hope Street, Suite 2000
Los Angeles, California 90071
Telephone: (213) 532-2000
Facsimile: (213) 532-2020

*Attorneys for Defendant*
THE PROCTER & GAMBLE CO.

## IN THE UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF CALIFORNIA

VERONICA BRENNER, Individually and on Behalf of All Others Similarly Situated,

*Plaintiff,*

v.

THE PROCTER & GAMBLE CO.,

*Defendant.*

Case No.: 8:16-1093-JLS-JCG

**NOTICE OF MOTION AND MOTION TO EXCLUDE THE EXPERT TESTIMONY OF COLIN B. WEIR; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF**

[Filed concurrently with the Declaration of Harold P. Weinberger and exhibits thereto; Proposed Order lodged herewith]

Date: January 12, 2018
Time: 2:30 p.m.
Assigned to: Hon. Josephine L. Staton

## <u>NOTICE OF MOTION AND MOTION</u>

**TO THE CLERK OF COURT AND TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

**PLEASE TAKE NOTICE** that on January 12, 2018, at 2:30 p.m., or as soon thereafter as counsel may be heard before the Honorable Josephine L. Staton, in Courtroom 10A of the above-entitled Court, located at the Ronald Reagan Federal Building and United States Courthouse, 411 W. Fourth St., Santa Ana, CA 92701, Defendant, The Procter & Gamble Company, ("P&G"), will, and hereby does, move the Court for an Order excluding the opinion testimony by Plaintiffs' proposed damages expert, Colin B. Weir, in support of their Motion for Class Certification, (Dkt No. 82).

Good cause exists to grant this motion. Mr. Weir's opinion testimony is irrelevant and unreliable when judged under the standards of Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993).

This motion is based upon this Notice of Motion and Motion, the accompanying Memorandum of Points and Authorities, the Declaration of Colin B. Weir, the Rebuttal Declarations of Dr. Keith R. Ugone and Dr. Ran Kivetz (attached as Exhibits to the Declaration of Harold P. Weinberger), the Declaration of Harold P. Weinberger filed concurrently herewith and the exhibits thereto, the pleadings and papers on file in this action, such arguments and authorities as may be presented at or before the hearing on this motion, and any other such matters as the Court may consider.

This motion is made following the conference of counsel pursuant to L.R. 7-3, which took place on October 16, 2017. Plaintiffs intend to oppose this motion.

1

DATED:  October 27, 2017

KRAMER LEVIN NAFTALIS &  FRANKEL LLP

By: /s/ Harold P. Weinberger

Harold P. Weinberger
Norman C. Simon
Eileen M. Patt

*Attorneys for Defendant*
THE PROCTER & GAMBLE CO.

2

# **TABLE OF CONTENTS**

**Page(s)**

MEMORANDUM OF POINTS AND AUTHORITIES ..................................................1

I.  INTRODUCTION ........................................................................................1

II.  BACKGROUND ..........................................................................................4

III.  LEGAL STANDARD ..................................................................................8

IV.  MR. WEIR'S DAMAGES CALCULATIONS ARE UNRELIABLE ..................9

   A.  Dr. Dennis' Conjoint Survey Does Not Properly Measure Demand ...............12

   B.  Dr. Dennis and Mr. Weir Fail to Consider Supply Side Factors .....................16

     i. Dr. Dennis and Mr. Weir ignore possible changes in quantity ………... 17

     ii. Dr. Dennis and Mr. Weir ignore other potential market shifts ………... 18

V.  INDIVIDUALIZED INQUIRIES RENDER MR. WEIR'S DAMAGES CALCULATIONS IRRELEVANT ............................................................................20

VI.  CONCLUSION ..........................................................................................22

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*AFMS LLC v. United Parcel Serv. Co..*,
  2014 WL 12515335 (C.D. Cal. Feb. 5, 2014) .................................................................18

*Apple, Inc. v. Samsung Elecs. Co.*,
  2014 WL 976898 (N.D. Cal. Mar. 6, 2014) ........................................................... 9, 11

*Astiana v. Ben & Jerry's Homemade, Inc.*,
  2014 WL 60097 (N.D. Cal. Jan. 7, 2014)................................................................ 19

*Estate of Barabin v. AstenJohnson*, *Inc.*,
  740 F.3d 457 (9th Cir. 2014) .......................................................................... 8, 12

*Brazil v. Dole Packaged Foods, LLC*,
  2014 WL 2466559 (N.D. Cal. May 30, 2014).........................................................22

*Cholakyan v. Mercedes-Benz USA*, LLC,
  281 F.R.D 534 (C.D. Cal. 2012)............................................................................ 9

*Comcast Corp. v. Behrend*,
  569 U.S. 27 (2013)............................................................................20, 21, 22

*In re ConAgra Foods, Inc.*,
  302 F.R.D. 537 (C.D. Cal. 2014)...................................................................... 20, 21

*Crescenta Valley Water Dist. v. Exxon Mobile Corp.*,
  2013 WL 12116333 (C.D. Cal. Jan. 8, 2013) ..........................................................15

*Daubert v. Merrell Dow Pharm., Inc.*,
  509 U.S. 579 (1993).............................................................................*passim*

*Ellis v. Costco Wholesale Corp.*,
  657 F.3d 970 (9th Cir. 2011) ............................................................................ 9

*Gen. Elec. Co. v. Joiner*,
  522 U.S. 136 (1997)............................................................................................ 8

ii

*Grodzitsky v. Am. Honda Motor Co.*,
    2014 WL 718431 (C.D. Cal. Feb. 19, 2014) ................................................. 9

*Hughes v. The Ester C Co.*,
    317 F.R.D. 333 (E.D.N.Y. 2016) .................................................................... 21

*Kargo Glob., Inc. v. Advance Magazine Publishers, Inc.*,
    2007 WL 2258688 (S.D.N.Y. Aug. 6, 2007) ................................................ 15

*In re: Lenovo Adware Litig.*,
    2016 WL 6277245 (N.D. Cal. Oct. 27, 2016) ............................................... 11

*Lust v. Merrell Dow Pharm., Inc.*,
    89 F.3d 594 (9th Cir. 1996) ...................................................................... 8, 15

*Morales, et al. v. Kraft Foods Grp., Inc*,
    2017 WL 2598556 (C.D. Cal. June 9, 2017) ................................................. 9

*In re NJOY, Inc. Consumer Class Action Litig.*,
    120 F. Supp. 3d 1050 (C.D. Cal. 2015) .................................................*passim*

*In re NJOY, Inc. Consumer Class Action Litig.*,
    2016 WL 787415 (C.D. Cal. Feb. 2, 2016) ............................................ 11, 19

*Perez v. State Farm Mut. Auto. Ins. Co.*,
    2012 WL 3116355 (N.D. Cal. July 31, 2012) .............................................. 18

*Reinsdorf v. Skechers U.S.A.*,
    922 F. Supp. 2d 866 (C.D. Cal. Feb. 6, 2013) .......................................... 8, 12

*Saavedra v. Eli Lilly & Co.*,
    2014 WL 7338930 (C.D. Cal. Dec. 18, 2014) ...................................9, 10, 11

*Sirko v. IBM*,
    2014 WL 4452699 (C.D. Cal. Sept. 3, 2014) ............................................... 20

*In re Tobacco Cases II*,
    2013 WL 7154428 (San Diego Super. Ct. Sept. 23, 2014) .......................... 10

*ThermoLife Int'l, LLC v. Gaspari Nutrition Inc.*,
    648 F. App'x 609 (9th Cir. 2016) .............................................................. 20

iii

*THOIP v. Walt Disney Co.*,
    690 F. Supp. 2d 218 (S.D.N.Y. 2010) ............................................................ 15

**Other Authorities**

Federal Rule of Evidence 702 ....................................................................... 1, 8, 22

Federal Rule of Civil Procedure 23 ................................................................. 3, 20

iv

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.   INTRODUCTION

Defendant, The Procter & Gamble Company, ("P&G"), respectfully submits this memorandum in support of its motion, pursuant to Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993), to exclude the testimony of Colin B. Weir, who Plaintiffs Victoria Brenner and Angela Banegas offer as an expert. Mr. Weir's opinions primarily concern his purported methodologies for estimating damages on a class-wide basis.[1]

Real world data gathered from retail outlets demonstrates that no price premium exists for Pampers Natural Clean Unscented wipes (the "Challenged Wipes"), defeating Plaintiffs' damages claims. Confronted with this data, Dr. J. Michael Dennis has designed a choice-based-conjoint survey (the "Conjoint Survey") — a methodology that has been rejected by some courts as providing evidence of a price premium — to escape this irrefutable evidence.  Mr. Weir's opinions are largely built on the results of Dr. Dennis' Conjoint Survey.[2]  The focus here is on two of those fatal flaws — (1) the lack of any supply side analysis, and (2) the failure to account for a competitive marketplace of products, which renders the Conjoint Survey and Mr. Weir's subsequent calculations meaningless. Together they insure that, even overlooking the many other methodological flaws, the Conjoint Survey cannot produce a reliable price premium but rather, at most, can reflect consumer preference for the Challenged Wipes over a fictitious "Clean" product that is unrepresentative of market alternatives.

---

[1] This motion is limited to Mr. Weir's methodology for calculating class-wide damages. Defendant reserves the right to challenge other aspects of Mr. Weir's opinions and his qualifications to provide his opinions.

[2] This motion adopts by reference the discussion of the myriad flaws in that survey more fully described in the Motion to Exclude the Expert Opinion Testimony of J. Michael Dennis, Ph.D., filed concurrently with this motion, ("Dennis Motion").

1

The case law and literature both make clear that the calculation of a price premium as charged in the marketplace must take account of competition and supply side factors; namely, costs of production, distribution, advertising, marketing, changes in quantity, and the reactions of competitors and retailers. Mr. Weir insists that the Court simply "take his word" for the fact that the competitive marketplace need not otherwise be accounted for in conducting a conjoint study aimed at determining a price premium. Instead, he baldly asserts that historical pricing and sales alone, the only factors upon which Dr. Dennis relies, are sufficient for these purposes. Likewise, Mr. Weir offers no support for the assertion that he can disregard the possibility of a change in the quantity supplied or other supply side issues because sales are fixed as a matter of history. Specifically, Mr. Weir asks the Court to accept a survey that measures a "but-for" world of an alternate product that never existed. At the same time, Mr. Weir refuses to acknowledge that constructing such a world requires an analysis of supply side factors. Instead, he insists that no supply side factors be modeled because sales of the product are historical. (Weir Tr.144-147).[3] In advancing this non-sequitur, Mr. Weir conflates the distinct concepts of calculating "price premiums" versus "damages" and ignores cases that have rejected this methodology to determine a price premium that, like this one, addresses sales that have already occurred.

Dr. Dennis purports to calculate "price premiums," that is, the delta between what the Challenged Wipes cost consumers and what they would have cost consumers had the word "Natural" been excluded from the Challenged Wipes' name (the "Challenged

---

[3] Citations to deposition transcripts are referenced by each witness's last name. The deposition transcript excerpts, the Declarations of Dr. Ran Kivetz ("Kivetz Decl.") and Dr. Keith R. Ugone ("Ugone Decl."), and other exhibits cited herein are attached to the Declaration of Harold P. Weinberger, dated October 27, 2017 ("Weinberger Decl."), filed concurrently with this motion and Defendant's Opposition to Plaintiffs' Motion for Class Certification.

2

Claim"). Mr. Weir then applies those "premiums" to historical sales of the Challenged Wipes to determine damages, thereby accounting for all class members' purchases and addressing Mr. Weir's professed concerns relating to historical sales. Were that delta to accurately account for both supply and demand in a competitive marketplace, it could theoretically measure a "price premium," if any exists, for the "Natural Clean" name. But determining the cost of a Product without the Challenged Claim involves analyzing a "counterfactual" or "but-for" world — that is, determining what the price would be of the Challenged Wipes without the Challenged Claim, a product that never existed. That exercise, in turn, requires an assessment of the competitive environment and supply side factors, which neither Dr. Dennis nor Mr. Weir have taken into account. Simply put, Mr. Weir either misunderstands the concept for which he is proffered as an expert, or, more likely, hopes that the Court will. Because Dr. Dennis' Conjoint Survey is unreliable and does not address the issue in this case, Mr. Weir's calculations and testimony should be excluded.

Separately, Mr. Weir's opinion fails to measure class-wide damages because Dr. Dennis' survey offers no means of isolating the allegedly misleading interpretation of the Challenged Claim — one for which consumers mistakenly interpret "Natural Clean" as portrayed on the Challenged Wipes to mean the absence of synthetic chemicals — versus a factually accurate and non-misleading interpretation, in which "Natural Clean" relates to the contextualizing claims describing the wipes such as unscented and hypoallergenic. While this inquiry is frequently explored in the context of class certification under Rule 23, to the extent the Court agrees that Mr. Weir's damages are incapable of class-wide proof, his testimony is irrelevant and he should be excluded under *Daubert* as well.[4]

---

[4] Defendant has advanced these and other arguments in its Opposition to Plaintiffs' Motion for Class Certification, filed concurrently with this motion. Defendant respectfully refers the Court to the Declarations of Dr. Keith R. Ugone and Dr. Ran

3

## II.   BACKGROUND

On September 19, 2017, Plaintiffs filed their Motion for Class Certification, (Dkt. No. 82), proffering in support the Declarations of Colin B. Weir ("Weir Decl.") and J. Michael Dennis, Ph.D. ("Dennis Decl."), dated September 5, 2017, (Dkt. Nos. 82-4, 82-5). Plaintiffs asked Mr. Weir to "ascertain whether it would be possible to determine damages on a class-wide basis using common evidence, and if so, to provide a framework for the calculation of damages suffered by the proposed class of plaintiffs . . . ." (Weir Decl. ¶ 3). Plaintiffs' damages theory is predicated on the "central allegation" that the name "Natural Clean" on the Challenged Wipes is "false and misleading because the Wipes contain synthetic chemicals." (Dkt No. 82-2, p. 11). "Plaintiffs' measure of damages therefore rests on the fact that a certain percentage of the price consumers paid for Wipes constituted a price premium solely attributable to this interpretation of the 'Natural Clean' representation." (Dkt No. 82-2, p. 11).

Real world pricing and market data demonstrate that there is no price premium associated with the name "Natural Clean."  As Dr. Ugone details in his declaration, actual observed wholesale and retail pricing data for the Natural Clean product as compared with its true market competitor, Pampers Baby Fresh, as well as comparisons of wholesale and retail pricing of the Challenged Wipes before and after its name was changed to Natural Clean, do not support Plaintiffs' claim that there was a premium associated with the name "Natural Clean." (*See* Ugone Decl. Sections VII & VIII). Moreover, Mr. Weir has in the past advocated a method called hedonic regression that uses such empirical data as a "first choice." (Weir Tr. 36-39). Nevertheless, and for obvious reasons, Mr. Weir's damages analysis ignores this real world data and instead relies entirely on the results of Dr. Dennis' Conjoint Survey, which is premised on

---

Kivetz submitted with that motion for a more detailed account of the deficiencies in Mr. Weir's and Dr. Dennis' opinions.

4

---

unrealistic fictional products and hypothetical claims to determine a purported "price premium."

Mr. Weir's calculations are in and of themselves "simple and straightforward." (Weir Decl. ¶ 57). As an initial matter, Mr. Weir obtained national retail sales data from IRI from 2011 to 2017, as well as state-level retail sales data for certain states over the same period. He then calculated the claimed retail dollar sales for the Challenged Wipes. Mr. Weir aggregated the retail dollar sales from the IRI data and projected out to total sales. (Weir Decl. ¶¶ 51-55). Mr. Weir then multiplied the total dollar sales he calculated for each jurisdiction during the putative Class period with the supposed "price premiums," expressed as a percentage, from Dr. Dennis' Conjoint Survey, concluding that the Class members in California, Florida and nine other jurisdictions sustained damages totaling $2,907,818. (Weir Decl. ¶¶ 57-60). Mr. Weir claims to have considered supply side factors in his damages analysis, but as he acknowledged, the only metrics on which he relied for gauging supply side factors are encompassed by "the historic number of units sold" and historical pricing data. (*See* Weir Decl. ¶¶ 35-44; *see also* Weir Tr. 271-273 ("the issues that you would need to think about and take into account in a survey such as the one that Dr. Dennis has done . . . are the inclusion in the survey of real world marketplace sales data and the assumption in the class context that sales are fixed as a matter of history. Q. Okay. And that's it. A. From an economic perspective.")).

Beyond simple arithmetic, Mr. Weir's declaration attempts to provide a rationale for his calculations and the Conjoint Survey' supposed ability to measure the supply side and market competition. While Mr. Weir says that Dr. Dennis used "a conjoint survey that took into account actual marketplace prices and other supply-side considerations and therefore is able to measure marketplace outcomes," (Weir Decl. ¶ 46), neither he nor Dr. Dennis provides an explanation as to how market competition and supply side considerations such as, for example, the costs of production, distribution, advertising, or

5

marketing, are accounted for in the Conjoint Survey beyond the mere inclusion of pricing data and historical sales. At his deposition, Mr. Weir testified that Dr. Dennis could explain if – and how – those supply side considerations were accounted for,[5] but Dr. Dennis confirmed during his own deposition that he considered none of them. (Dennis Tr. 239-243). The totality of his supply side considerations were encompassed by his use of historical pricing as the price points in his survey and then in calculating the "average retail prices" used to derive his claimed "price premiums." Meanwhile, Dr. Dennis took the data from his Conjoint Study and ran it through what he called a "market simulation" that addressed only three choices, a product called "Natural Clean," another called "Clean," or neither of the two. (*See* Dennis Decl. ¶ 47).

Because, as detailed below, the very literature cited in Mr. Weir's declaration makes clear that determination of a price premium requires consideration of the competitive marketplace and supply side factors, Mr. Weir was pressed at his deposition to identify authoritative support for his position that calculation of a price premium for historical purposes was not subject to those strictures. (Weir Tr. 208-210, *see also* Weir Tr. 78-85). On October 24, the day Defendant's expert reports were due, Mr. Weir identified three authorities, (*see* Weinberger Decl. ¶ 2 & Exhs. 20, 21 & 22), but in fact

---

[5] *See* Weir Tr. 142-143 ("Q. How did Dr. Dennis incorporate the cost of manufacturing in his survey design and analysis? A. You'll need to ask that of him. Q. So you don't know. A. That's correct. Q. Okay. Same question for the cost of distribution, advertising, and marketing . . . . A. Again, unless he's doing that by the inclusion of the [historical] prices that have already been set by the interaction of supply and demand, you would have to go ask him."); Weir Tr. 149-151 ("A. So I'm aware that [Dr. Dennis] included the real world market pricing data. I'm aware that his analysis is premised on the concept that the quantity supplied of these products is fixed as a matter of history. And if there are any other ways in which he has considered or included those things [i.e. cost of manufacturing, distribution, advertising, marketing, and impact of competing products], you will have to ask him.")

6

none of them address that issue at all.[6]

Moreover, while Dr. Dennis claims he ran his market simulation to test for the value of additional features, such as adding in the term "hypoallergenic," (*see* Dennis Decl. ¶ 49), this so-called "sensitivity analysis" is a straw man. As Dr. Kivetz explains, Dr. Dennis did not run trade-offs or test interactions; he simply *added* the valuation of a feature to both sides of the equation. The "sensitivity analysis" that Dr. Dennis performed thus did not permit him to assess whether contextualizing claims (that is, unscented and hypoallergenic) have any value and whether they affect (or interact with) the valuation of the name "Natural Clean."[7] (*See* Kivetz Decl. ¶¶ 97-113).

---

[6] The articles deal generally with the use of conjoint analysis to determine consumer willingness to pay and consumer preference and *do not* address deviating from conjoint requirements where historical sales are involved. (*See* Ugone Decl. pp. 113, n. 300; Kivetz Decl. ¶ 138).

[7] The inability to measure contextualizing claims was by design. If consumers' preferences incorporate an interaction between attributes, Dr. Dennis' data and models cannot detect it in light of how he modeled his attribute profiles and there is thus no way for Dr. Dennis to simply re-run a test using his current data. (Kivetz Decl. ¶¶ 100-106). In examining the raw data, Dr. Kivetz found telling examples of Dr. Dennis' flawed analysis, (Kivetz Decl. ¶ 110):

> Dr. Dennis' analysis shows a 7.6% premium for Pampers 64-wipe packs of 'Natural Clean' (*i.e.*, an equivalent 'Clean' pack needs to be priced at $2.30 to receive equal share as the 'Natural Clean' pack priced at $2.49). However, the 'Natural Clean' pack is valued *less* than a 'Clean' pack specified as hypoallergenic (*i.e.*, $2.49 'Natural Clean' and $2.74 hypoallergenic 'Clean' are equally valued). Likewise, the 'Natural Clean' pack is valued *less* than a 'Clean' pack specified as unscented (*i.e.*, $2.49 'Natural Clean' and $2.69 unscented 'Clean' are equally valued). Given the high value placed on "unscented" and the fact that the Dennis Conjoint Survey does *not* allow quantifying any interaction effect, it is impossible to rule out that the measured advantage in utility of 'Natural Clean' (compared to 'Clean') is attributable to a belief that 'Natural Clean' conveys an 'unscented' benefit (and 'Clean' does not).

7

## III.    LEGAL STANDARD

Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993) govern the admissibility of expert testimony. The burden of establishing admissibility of such testimony falls with the proponent. *Lust v. Merrell Dow Pharm., Inc.*, 89 F.3d 594, 598 (9th Cir. 1996). District courts serve a gatekeeping function to ensure that scientific testimony or evidence is not admitted unless it is both relevant and reliable. *Daubert*, 509 U.S. at 589; *see also Estate of Barabin v. AstenJohnson, Inc.*, 740 F.3d 457, 463 (9th Cir. 2014).

The relevance inquiry seeks to limit testimony that does not "logically advance a material aspect of the party's case," *Barabin*, 740 F.3d at 463 (citation and quotations omitted). Reliability requires the Court to determine that "the testimony is based on sufficient facts or data, . . . is the product of reliable principles and methods; and . . . the expert has reliably applied the principles and methods to the facts of the case." Fed. R. Evid. 702; *see also Reinsdorf v. Skechers U.S.A.*, 922 F. Supp. 2d 866, 878 (C.D. Cal. Feb. 6, 2013) ("[t]he first step in the court's analysis of any survey . . . is to determine whether the survey is admissible, relevant, and conducted according to accepted principles.").

"The trial court's gatekeeping function requires more than simply 'taking the expert's word for it.'" Fed. R. Evid. 702 advisory comm. note (2000). "The expert's testimony must be grounded in an accepted body of learning or experience in the expert's field, and the expert must explain how the conclusion is so grounded." *Id.* "[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).

The requirements of *Daubert* and Rule 702 apply to expert testimony proffered in connection with class certification. "If expert testimony critical to class certification is

8

challenged, a district court must make a determination as to the admissibility and persuasiveness of that evidence before certifying a class." *Grodzitsky v. Am. Honda Motor Co.*, 2014 WL 718431, at *6 (C.D. Cal. Feb. 19, 2014) citing *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970 (9th Cir. 2011); *see also Cholakyan v. Mercedes-Benz USA*, LLC, 281 F.R.D 534, 541-42 (C.D. Cal. 2012).

## IV.   MR. WEIR'S DAMAGES CALCULATIONS ARE UNRELIABLE

Plaintiffs' proposed measure of damages is the alleged "price premium" that Pampers Natural Clean baby wipes purchasers paid for the Challenged Wipes solely attributable to the words "Natural Clean," where purchasers understood it to mean that the wipes did not contain synthetic chemicals. (*See* Dkt No. 82-2, p. 11). The "premium," if one exists, is the difference between the market price of the Challenged Wipes with the "Natural Clean" name and the market price of the Challenged Wipes without it. Market prices necessarily depend upon the interaction of supply and demand. (Ugone Decl. ¶ 122). Courts have refused to certify classes under California's consumer protection statutes where plaintiffs offered conjoint analyses because they failed to present a damages model that considers both. *See, e.g., Morales, et al. v. Kraft Foods Grp., Inc*, 2017 WL 2598556 (C.D. Cal. June 9, 2017); *In re NJOY, Inc. Consumer Class Action Litig.*, 120 F. Supp. 3d 1050 (C.D. Cal. 2015) ("*NJOY I*"); *Saavedra v. Eli Lilly & Co.*, 2014 WL 7338930 (C.D. Cal. Dec. 18, 2014); *see also Apple, Inc. v. Samsung Elecs. Co.*, 2014 WL 976898 (N.D. Cal. Mar. 6, 2014) (finding conjoint analysis insufficient in context of a preliminary injunction).[8]

"Conjoint analysis is a statistical technique capable of using survey data to determine how consumers value a product's individual attributes – often called the

---

[8] Courts sometimes deny *Daubert* motions but then reject the proffered testimony as sufficient to support class certification. *See, e.g., Morales*, 2017 WL 2598556; *NJOY I*, 120 F. Supp. 3d 1050.

9

market's willingness to pay." *Saavedra*, 2014 WL 7338930, at *4 . For that reason, designed and implemented correctly, a conjoint survey can theoretically isolate the "demand" side of the equation. But conjoint surveys are not intended to measure that demand relative to supply and for that reason do not determine a "price premium" for a product. "[C]onjoint utilities cannot account for many real-world factors that shape market shares . . . . Therefore, the [results] usually should not be interpreted as market shares, but as relative indications of preference." (Bryan K. Orme, *Getting Started with Conjoint Analysis*, Research Publishers (2010), at p. 102 (hereinafter "Orme Book") (Weinberger Exh. 23) (Orme's book is cited by Mr. Weir at Weir Decl. p. 6, n. 18,19 & Exhibit 2)). *See also In re Tobacco Cases II*, JCCP No. 4042, 2013 WL 7154428, at *7 (San Diego Super. Ct. Sept. 23, 2013) ("Conjoint analysis was not intended to be used for the purpose employed by [p]laintiffs in this case. Although conjoint surveys have been utilized to determine or rank consumer preferences for certain product attributes, conjoint analysis has not been accepted in the relevant scientific community as a means of assigning monetary value to any particular attribute.").

In *NJOY I* the court denied class certification, concluding damages were incapable of being measured class-wide. One of plaintiffs' proffered damages models was a conjoint survey. The court held it was an insufficient damages model because it "looks only to the demand side of the market equation, converting what is properly an objective evaluation of relative fair market values into a seemingly subjective inquiry of what an average consumer wants." *NJOY I*, 120 F. Supp. 3d at 1119 (internal citation and quotations omitted). The conjoint survey methodology fails to "consider other factors in a functioning marketplace," (*id.*), such as, "the price for which [the manufacturer] is willing to sell its products, what other [competing] manufacturers say about their products, and the prices at which those entities are willing to sell their products" (*id.* at 1120). Therefore it "does not address the fair *market* value of [the Challenged Wipes]

10

absent the" challenged claim. *Id.*[9] *See also Saavedra*, 2014 WL 7338930, at *5 ("By looking only to consumer demand while ignoring supply, [plaintiffs'] method of computing damages converts the lost-expectation theory from an objective evaluation of relative fair market values to a seemingly subjective inquiry of what an average consumer wants"); *Apple*, 2014 WL 976898, at *12 (conjoint analysis "measures only demand for the . . . features in [the survey's] limited market and does not account for supply at all, much less the real-world intersection of market demand and market supply, which sets the real-world market price for the devices").

In an attempt to address the court's concerns, the expert in *NJOY* proposed incorporating "different market brands and actual market prices directly into the choice sets offered to participants in the survey" in an attempt to "'tether' the results 'to a functioning market and thus to the product's fair market value.'" *In re NJOY, Inc. Consumer Class Action Litig.*, 2016 WL 787415, at *6-7 (C.D. Cal. Feb. 2, 2016) ("*NJOY II*"). The court concluded there was no meaningful distinction between the old model and the new because it still only looked to the demand side of the equation, "[ignoring] the price at which [defendant], and other [competing] manufacturers, would be willing to sell their products." *Id.* at *7 (emphasis added).[10]

---

[9] The court in *NJOY I* noted that certain courts have permitted the use of similar survey techniques to assess damages in consumer class actions, but held that those courts "did not address whether market supply factors must be taken into consideration" because defendants did not raise the issue. The court therefore concluded that those cases cannot stand for the proposition "that market factors can be ignored in determining the price premium attributable to product misrepresentations." *NJOY I*, 120 F. Supp. 3d at 1121.

[10] While the court *In re: Lenovo Adware Litig.*, 2016 WL 6277245, at *21 (N.D. Cal. Oct. 27, 2016) distinguished *NJOY I* on the grounds that by consulting market prices and holding sales constant plaintiffs had accounted for supply side considerations, it did not address *NJOY II*, with which it stands in direct conflict. As explained below, market prices and historical sales alone do not account for supply when the survey exercise is intended to and does manipulate demand by introducing a hypothetical product. Because

11

As is shown below, because of the way in which he conducted it, Dr. Dennis' Conjoint Survey does not even properly measure "demand." Even if it did, Mr. Weir's damages model fails because he categorically ignores potential corresponding changes to quantity supplied when calculating his supposed "price premiums."

**A. Dr. Dennis' Conjoint Survey Does Not Properly Measure Demand**[11]

There are two fundamental flaws, among many others, that render Dr. Dennis' calculations of consumer demand meaningless and unreliable. First, he did not include the relevant attributes in the choice profiles shown to respondents and therefore was unable to accurately assess consumer preference for the name "Natural Clean" in a relevant marketplace. Second, he ran a "market simulator" in which he failed to present actual competitive trade-offs, measuring a fictitious product named "Clean" against the "Natural Clean" product while holding all other attributes constant. Both of these are in contravention of accepted methodology. *See Estate of Barabin*, 740 F.3d at 463 (relevant inquiry is not outcome of survey but soundness of expert's methodology).

Dr. Dennis failed to include relevant competitive attributes in his Conjoint Survey profiles, ignoring the required methodology to simulate the realistic choices of consumers. (*See* Kivetz Decl. Section A.2.1; Ugone Decl. XI.B.2); *see also Reinsdorf*, 922 F. Supp. 2d at 878 ("Unless survey evidence is conducted according to accepted principles, it is not admissible in the first instance.").[12] Compounding this error, Dr.

Dr. Dennis' Conjoint Survey was designed to do just that, it requires a corresponding analysis of possible changes to supply. (*See infra*, pp. 16-20).

[11] The ways in which the Conjoint Survey fails to measure demand are enumerated more fully in the Motion to Exclude the Expert Testimony of J. Michael Dennis, Ph.D., filed concurrently with this motion.

[12] While not vouching for Dr. Dennis' attribute selection Mr. Weir opined that the only "two choices that need to be present" in the Conjoint Survey were "Natural Clean" and "Clean," and that it was "not necessary to include all attributes or potential levels of

12

Dennis input the results of his conjoint analysis, and subsequent Hierarchical Bayesian regression, into a market simulation program known as Sawtooth where he only analyzed data related to his limited representation of the "Natural Clean" product and a fictional product called "Clean."

While Mr. Weir "can't speak to how the [Sawtooth] software [actually] works," (Weir Tr. 148), he vouched for Dr. Dennis' use of the market simulator in this fashion, opining that "for purposes of conducting the market simulator, or simulation, it is not necessary to include in the simulator other competitive offerings." (Weir Tr. 90-91, 215). Both the Sawtooth Software protocol and literature Mr. Weir himself cites (Weir Decl. p. 6, n. 18, 19) contradict his testimony, explaining that the analysis must include "the main exemplars of competing brands and product positions" (*Proceedings of the Sawtooth Software Conference* (October 2013) (Weinberger Exh. 24)) and that the market simulation "involves simulating a realistic competitive scenario" by testing the product of interest against several competitors and then repeating the simulations introducing the feature of interest, leaving all else constant. (*See* Orme Book, p. 92 (Weinberger Exh. 23); Bryan K. Orme, "Assessing the monetary value of attribute levels with conjoint analysis: warnings and suggestions," Sawtooth Software Inc., Sequim, WA (2001) (Weinberger Exh. 27)).[13] The literature provides a useful example:

---

attributes in a conjoint choice-based study." (Weir Tr. 90-91, 98-99). This is a proposition with which even Dr. Dennis did not agree: "I can tell you from other conversations with Mr. Weir that is not actually his belief. He understands that the distracter levels are very, very important, and I think if given a second chance to answer that question he would answer it differently." (Dennis Tr. 175-176).

[13] Because Dr. Dennis failed to include the relevant attributes in his survey questionnaire, he in fact could not have run an accurate market simulation even if he had so desired. (*See, e.g.*, Orme Book, p. 92 ("if you have measured the relevant brands and features offered in the market, you can simulate a realistic market scenario within the market simulator") (Weinberger Exh. 23)).

13

> Estimates of market demand should also be based on specific objectives. For example, the objective may be to determine how much more may be charged for a product or service by offering a new feature without any net loss in market acceptance. This approach involves simulating a realistic competitive scenario with a conjoint market simulator. Assume four products (A through D) representing the current relevant products in the marketplace. Further assume that the firm is interested in offering an additional feature for product A, and wants to estimate what new price can be charged while maintaining the same share of preference. We first simulate a base case with products A through D placed in competition with one another, where A does not include the new feature. We record its share of preference (say, 15 percent). We then conduct another simulation in which we improve A by offering a new feature (and hold the competition B through D constant). The share of preference for A should increase (say, to 20 percent). We then perform additional simulations (again holding competition constant) raising the price of the new product A until its share of preference again drops to the original 15 percent. The difference in price between the more expensive improved Product A that captures 15 percent and the old Product A that captured 15 percent reflects the incremental monetary value that the market will bear for the new feature, given the competitive context and the objective of maintaining share constant.

(Orme Book, p. 88) (Weinberger Exh. 23).

Indeed, Mr. Weir acknowledged that Dr. Dennis simulations were not done the way Sawtooth requires. (Weir Tr. 119-23). What Dr. Dennis did is not a market simulation, but is rather a choice preference between an unrealistically named product, "Clean," and a product named "Natural Clean" in a market where there are no other options and all other attributes such as price and scent, for example, are identical. The resulting "premiums" Dr. Dennis claims to have derived are therefore totally contrived and meaningless in the real world and cannot serve as a basis from which to calculate damages.[14] (*See* Kivetz Decl. ¶¶ 133-139; Ugone Decl. Section XI.A).

---

[14] The reason it is insufficient to merely conduct a trade-off between a "Natural Clean" product and a "Clean" product is because of what economists refer to as the "Gilligan's

14

Neither Dr. Dennis nor Mr. Weir are able to justify the deviation from Sawtooth's protocol, nor are they able to explain how the simulation, as conducted here, approximates the marketplace. The resulting calculations Dr. Dennis derived are therefore an unreliable measurement of consumer demand.[15] *See e.g.*, *THOIP v. Walt Disney Co.*, 690 F. Supp. 2d 218, 234-39 (S.D.N.Y. 2010) (finding survey unreliable in trademark infringement action because it "failed to approximate marketplace conditions" and lacked a control); *see also Kargo Glob., Inc. v. Advance Magazine Publishers, Inc.*, 06 CIV 550 JFK, 2007 WL 2258688, at *7-11 (S.D.N.Y. Aug. 6, 2007) (accord). Mr.

Island" scenario. The wealthy Howells, if confronted with just one boat to get them off the island, would be willing to pay their net worth. But if there is a fleet of ships, and in light of the reduced means of the others stranded on the island that will also temper the market, the price will be significantly lower to transport them home. (*See*, *e.g.*, Orme Book, at pp. 86-87) (Weinberger Exh. 23). Bryan Orme, President of Sawtooth Software, provides the following additional example: "What is your willingness to pay for a color monitor for your laptop computer versus a monochrome screen? Assume we conducted a conjoint analysis including monochrome versus color monitors. If we computed your willingness to pay for color over monochrome, we would likely find that the incremental value of color over monochrome is worth a thousand dollars or more. But how meaningful is this information to a laptop manufacturer given the fact that laptops with color monitors are readily available on the market at quite inexpensive prices?" (Orme Book, p. 87) (Weinberger Exh. 23)). Similarly, Dr. Dennis' market simulation failed to incorporate the fact that baby wipes products are readily available on the market at a variety of prices.

[15] The fallacy of the market simulator results is perhaps best illustrated by what Dr. Ugone has shown the marketplace reality actually demonstrates. (Ugone Decl. Sections VII & VIII) (demonstrating how price comparisons between two comparable Pampers products reveal no premium, nor do price comparisons of the Challenged Wipes before and after the Challenged Claim was added). *See Crescenta Valley Water Dist. v. Exxon Mobile Corp.*, 2013 WL 12116333, at *5 (C.D. Cal. Jan. 8, 2013)("Where an expert purports to apply principles and methods in accordance with professional standards, and yet reaches conclusions that are contrary to real life data before the Court, the trial court may fairly suspect that the principles and methods have not been faithfully applied.") (citations and quotations omitted).

15

Weir's calculations, which are based on the alleged "premiums" derived from the market simulator, cannot accurately measure damages related to the "Natural Clean" name.

### B. Dr. Dennis and Mr. Weir Fail to Consider Supply Side Factors

Assuming *arguendo* that Dr. Dennis' profile choices in the conjoint survey and the subsequent market simulation could accurately measure demand, (which they do not), Mr. Weir and Dr. Dennis fail to offer any functional model to account for supply side considerations, rendering a "price premium" calculation impossible within their suggested framework. The fact of running a market simulation itself does not solve the problem of their failure to consider supply. (*See* Orme Book, p. 92 (Weinberger Exh. 23) ("The market simulator focuses on the demand side of the marketing equation; but it is also important to pay attention to the supply side and take the costs of producing different products/services into consideration")).

Both Mr. Weir and Dr. Dennis recognize the importance of considering supply side factors in "price premium" and "damages" calculations and for that reason they take pains to state that they did so here. (Weir Decl. ¶ 38; Dennis Decl. ¶ 46). But both Dr. Dennis and Mr. Weir conceded that their supply side considerations are functionally limited to historical data on pricing and sales. Nevertheless, they both insist that (1) because sales are fixed as a matter of history they do not have to account for the possibility of changes in quantity, and (2) because Dr. Dennis incorporates actual market prices into the product profile choices in his Conjoint Study he has adequately accounted for all necessary supply side considerations. (*See* Weir Tr. 144-164, 271-273; Dennis Tr. 62-66, 238-243).

These assumptions are fundamentally at odds with basic economic precepts. In order to understand the fallacy of their unsupported assertions, it is important to keep in mind that what the Conjoint Survey purports to do is measure how consumers' appetites will adjust for the "Natural Clean" baby wipes in the absence of the word "Natural."

16

Because there is no real marketplace in which this alternate product existed, Dr. Dennis is creating what economists call a counterfactual or "but-for" universe. In the absence of supply side considerations, this "but-for" universe is a reflection solely of shifting demand. In order to calculate an actual price premium, it is necessary to ascertain the corresponding adjustments that take place with respect to the kinds of supply side factors identified earlier, (*see supra*, p. 2). (*See* Ugone Decl. ¶¶ 120-123, 152-163; Kivetz Decl. ¶¶ 140-153).

### i. *Dr. Dennis and Mr. Weir ignore possible changes in quantity*.

The need to create a "but-for" world in order to determine a price premium demonstrates the myth of each of Dr. Dennis' and Mr. Weir's assumptions. According to the law of supply and demand, the "quantity supplied of a product generally rises when the price of the good rises" and generally "decrease[s] when the price decreases." (Ugone Decl. ¶ 157). What the Conjoint Survey purports to show is a decrease in demand and a corresponding decrease in price, but it ignores that a corresponding decrease in quantity is likely to result. However, when quantity supplied is responsive to a change in price, the equilibrium price after a decrease in demand will have adjusted down by an amount less than the change in demand. Consequently, any final price premium for the Natural Clean baby wipes would be lower than that claimed by Dr. Dennis and Mr. Weir, and possibly non-existent, in this new market reality. (*See* Ugone Decl. ¶¶ 157-159). Neither Dr. Dennis nor Mr. Weir provide any authoritative justification for their decision to hold quantity constant.

Mr. Weir readily concedes that the Conjoint Survey creates a "but-for" world in which Dr. Dennis attempts to calculate the difference between consumer preference for a product that does not exist, but he refuses to concede that there are then "but-for" marketplace interactions that need to be considered in order to accurately adjust calculations to arrive at an actual market premium. (Weir Tr. 144-164). Mr. Weir's

17

argument is that the model can hold supply constant because this was a historical conjoint analysis rather than a prospective one. (*Id.*; *see also* Weir Tr. 209:6-210:24). Mr. Weir cites no authority for this proposition in his declaration, and the articles belatedly supplied in response to requests made at and after his deposition say no such thing. (*See supra*, pp. 6-7, n. 6). Cases that have rejected conjoint analysis have dealt with historical sales, yet they have not accepted the spurious rationale advanced by Mr. Weir here. (*See supra*, pp. 9-10). As such, Mr. Weir's proffered expertise amounts to little more than "take my word for it," and as a result his testimony and damages calculations are unreliable and impermissible under *Daubert*. *See*, *e.g.*, *Perez v. State Farm Mut. Auto. Ins. Co.*, 2012 WL 3116355, at *2 (N.D. Cal. July 31, 2012) (holding expert's assertion that "'[his] experience and [his] report speak for itself'" was type of *ipse dixit* excludable under *Daubert*); *see also United Parcel Serv. Co.*, 2014 WL 12515335, at *7 (C.D. Cal. Feb. 5, 2014) (because expert could not "define or explain the methodology" it was "impossible for the Court to determine whether it was applied correctly").

ii.   *Dr. Dennis and Mr. Weir ignore other potential market shifts*.

Separate and apart from changes in quantity, Dr. Dennis and Mr. Weir pay lip service to concepts such as costs of production, distribution, advertising, and marketing, but their only recognition of these supply side factors is in the inclusion of "real market prices" in Dr. Dennis' Conjoint Survey. (Weir Tr. 144-164; Dennis Tr. 238-243).

As an initial matter, prices are not necessarily a sufficient proxy for supply side factors even in a contemporary marketplace; historical prices are even less relevant a proxy for all supply side factors in a fictitious "but-for" marketplace. In this new paradigm, without running an equilibrium analysis there is no way to know how the change in demand will alter the price at which a manufacturer is willing to sell, how competing manufacturers respond in terms of pricing their own goods, and how retailers will respond in setting prices in the market. All of those supply side considerations will

18

have an impact on any "premium" for a product, if one exists at all. (*See* Ugone Decl. ¶¶ 120-123, 152-163; Kivetz Decl. ¶¶ 140-153; *see also* Dennis Tr. 330 (noting  he did not do an equilibrium analysis and as it is not a test he standardly performs he believes it to be unnecessary)); *see also NJOY I*, 120 F. Supp. 3d 1050; *NJOY II*, 2016 WL 787415.[16]

As Dr. Kivetz and Dr. Ugone explain, the unsubstantiated assumption underlying Dr. Dennis' and Mr. Weir's contention that historical prices encompass all the necessary supply side factors is that "Pampers' competitors would not react to the removal of the 'Natural Clean' claim from the Pampers wipes packages, for example by changing their product features, advertising/packaging claims, or their products' prices.   Academic research has demonstrated that such an assumption of *no* competitive (or no supply side) reaction is unrealistic and erroneous." (Kivetz Decl. ¶ 145; *see also* Ugone Decl. ¶ 123 & p. 86, n. 221).[17] Not only is this erroneous, but academic research shows that ignoring

---

[16] Mr. Weir argues that it is an "economic perversion for a defendant . . . to simply state that it would never have adjusted its prices or would not have adjusted them enough so as to meet demand . . . ." because of the obvious conflict of interest. (Weir Decl. ¶ 37). What is actually perverse is Plaintiffs' argument that they need not conduct a full damages analysis and can simply assume there would be no supply side adjustments, particularly when they bear the burden to demonstrate the existence of a premium. *Astiana v. Ben & Jerry's Homemade, Inc.*, 2014 WL 60097, *13 (N.D. Cal. Jan. 7, 2014).

[17] Mr. Weir passed the responsibility of explaining this off to Dr. Dennis. (Weir Tr. 183-185) (when asked whether a manufacturer's reduction in price of a product might trigger a competitive response from a competitor, Mr. Weir replied, "[o]n a going-forward basis and not on a historical basis" and as to whether Dr. Dennis' market simulation takes into account any such strategic competitive response, you are "going to have to ask Dr. Dennis that question."). For his part, Dr. Dennis agreed with the premise that a reduction in the price of the Pampers product could have a negative effect on the demand for a competitor's product. When asked why if there is a reduction in demand, he would hold constant the supply, he replied "That's not my assignment. My assignment is to measure how much value these consumers place on that Natural representation." (Dennis Tr. 245). He reiterated this again when asked whether he thought it was counter-intuitive that if the demand were to drop in his "but-for" world that supply would not? He acknowledged that

19

---

supply side reactions "almost always overstates the value of the feature or claim at issue in terms of willingness to pay and willingness to buy." (Kivetz Decl. ¶ 145).

As courts have held, without considering supply side factors Dr. Dennis' "price premiums" are irrelevant and unreliable. (*See* cases cited *supra* at pp. 9-11). Mr. Weir's opinion as to damages is similarly unreliable and should be excluded. *See*, *e.g.*, *ThermoLife Int'l, LLC v. Gaspari Nutrition Inc.*, 648 F. App'x 609, 614 (9th Cir. 2016) (excluding expert's opinion on damages when underlying report on which it relied to establish market share was struck); *Sirko v. IBM*, 2014 WL 4452699, at *6 (C.D. Cal. Sept. 3, 2014) (striking expert declarations to extent they relied on unreliable survey).

## V.   INDIVIDUALIZED   INQUIRIES   RENDER   MR.   WEIR'S   DAMAGES CALCULATIONS IRRELEVANT

For purposes of class certification under Rule 23, Mr. Weir must proffer a valid methodology showing that all class members suffered an injury and that damages "are capable of measurement on a classwide basis." *Comcast Corp. v. Behrend*, 569 U.S. 27, 34 (2013). Mr. Weir's damages model must also be able to "isolate the price premium associated with misleading consumers in [the] particular fashion" that is the subject of the complaint. *In re ConAgra Foods, Inc.*, 302 F.R.D. 537, 579 (C.D. Cal. 2014) ("*ConAgra*

---

potentially it could, but explained that was not what he was calculating: "Well, because I am measuring the *consumer preference shares*, and the consumer preference shares are based on the availability of this product on the assumption that the consumers would have this product available to them if they purchased it." (Dennis Tr. 252) (emphasis added). When asked then how exactly he simulated the impact of competitive responses in calculating the alleged price premium he noted: "A. Well, I think it's a fair statement that that is not a capability that conjoint survey have. Q. So you don't do it. A. Not just me. Anybody who does conjoint surveys, you are measuring what consumers preferences are going to be given different product profiles put in front of respondents." (Dennis Tr. 256; *see generally* Dennis Tr. 249-256).

*I*").[18] While the *Comcast* inquiry is considered in the context of class certification, it is intimately connected to a *Daubert* challenge; insofar as Mr. Weir's methodology cannot calculate damages class-wide consistently with the Plaintiffs' theory of liability, his opinion is irrelevant and unhelpful to the trier of fact. *See Daubert*, 509 U.S. at 591.

Plaintiffs' claim is that "Natural Clean," is misleading because it communicates that the Challenged Wipes contains no synthetic chemicals. But P&G contends that term is encompassed by its contextualizing claims, such as the fact that the Challenged Wipes are unscented and hypoallergenic. While "unscented" and "hypoallergenic" are included as attributes in the Conjoint Survey, Dr. Dennis failed to account for the interaction between those claims and the name "Natural Clean."[19] (*See supra*, p. 7 & n. 7). Because the alleged "price premium" estimate on which Mr. Weir relies encompasses multiple

[18] Mr. Weir is aware that his damages model must isolate the price premium associated with the way in which plaintiffs allege to have been misled because the courts in both *ConAgra* and *Hughes v. The Ester C. Co.* rejected his damages models for failing to do so. In *In re ConAgra Foods, Inc*., 302 F.R.D. 537 (C.D. Cal. 2014), the plaintiffs challenged the defendant's "natural" claim, but the court concluded that as the term has "many implications," not all of which were alleged to be false, Mr. Weir's damages model had to – and did not – take into account all of the meanings consumers might ascribe to the word "natural." *Id*. at 547, 578-9. Similarly, in *Hughes*, 317 F.R.D. 333, 355-56 (E.D.N.Y. 2016), the court found that Mr. Weir's methodology failed to account for the fact that the challenged claim, "The Better Vitamin C," "conceivably encapsulates some, if not all," of the surrounding representations on the package. Failing to isolate the challenged claim from these other representations "result[ed] in an overvaluing of the price premium attributable to the alleged misrepresentation. In the alternative, isolation of [the challenged claim] render[ed] it meaningless because consumers . . . will interpret 'better' differently based on the surrounding context." *Id*. at 355-356.

[19] This flaw was compounded by his artificial separation of contextualizing claims from the "Natural Clean" name, as discussed further in the Dennis Motion, pp. 17-19.

21

interpretations of "Natural Clean," including non-misleading interpretations, (Kivetz Decl. ¶¶ 86-113, Ugone Decl. ¶¶ 69-75), it is irrelevant.[20]

## VI.    CONCLUSION

For the reasons articulated herein, P&G respectfully requests that the Court exclude the testimony of Colin B. Weir because it is irrelevant, unreliable, and inadmissible under the standards of Federal Rule of Evidence 702 and *Daubert*.

Dated:  October 27, 2017                   Respectfully submitted,

                                                        KRAMER LEVIN NAFTALIS &  FRANKEL LLP

                                                        By: /s/ Harold P. Weinberger
                                                        Harold P. Weinberger
                                                        Norman C. Simon
                                                        Eileen M. Patt

                                                        *Attorneys for Defendant*
                                                        THE PROCTER & GAMBLE CO.

---

[20] Mr. Weir also fails to present a damages model that accounts for other distinctions that could alter the "price premiums," had Dr. Dennis successfully measured any. Dr. Dennis' "price premiums" are expressed as constant percentage amounts for each package size, making no distinction for factors such as, for example, the Pampers brand name or whether the product was on a sale promotion, and so forth. *See*, *e.g.*, *Brazil v. Dole Packaged Foods, LLC*, 2014 WL 2466559, at *15-16 (N.D. Cal. May 30, 2014) (price premium damages model insufficient under *Comcast* because it failed to account for factors that may cause consumer preference for the challenged product "such as brand loyalty or quality differences"). Mr. Weir also fails to account for the wide variation in retail prices, varying geographies, sales channels, types of packaging (fitment vs. refill), and different time periods. (*See* Ugone Decl. ¶¶ 138-151). There is no way to conclude that it was therefore appropriate or reliable for him to extrapolate the claimed "price premiums" to the entire putative Class.

22